# EXHIBIT 1

To the Declaration of Bruce Isaacson

## TABLE OF CONTENTS

**Overview of My Survey and Findings**

**My Qualifications**

**Compensation and Materials Reviewed**

**Description of the T-Shirt Survey**

**Methodology for the T-Shirt Survey**

**Findings from the Survey**

**Discussion and Conclusions**

**Exhibits**

Exhibit 1:  Bruce Isaacson CV and Testimony Experience

Exhibit 2:  Test and Control Stimuli

Exhibit 3:  Demographics of Urban Outfitters Shoppers

Exhibit 4:  Screeners and Questionnaires

Exhibit 5:  Interviewer and Supervisor Instructions

Exhibit 6:  Validation Questionnaire

Exhibit 7:  All Data and Verbatim Responses

Exhibit 8:  Codes Used to Analyze Verbatim Comments

Exhibit 9:  Cross Tabulations

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

1.      I have been retained by attorneys for the defendants/counterclaim plaintiffs in the above litigation. This report provides the results of a survey I conducted measuring whether potential purchasers are likely to believe that Bruce Lee or a related entity (such as his family, estate, or managers) made, endorsed, or gave permission or approval to make the filmstrip t-shirt referenced in the plaintiff's Second Amended Complaint and bearing an image that may be, or may be perceived to be, Bruce Lee.

2.      The statements and opinions expressed in this report are based on my consideration of the research I conducted in this matter, information I have reviewed in this matter, my expertise, and my experience.  I reserve the right to supplement this report.

## Overview of My Survey and Findings

3.      In my survey, respondents were shown a filmstrip t-shirt (the test shirt) or a control shirt. The "filmstrip t-shirt" shows a filmstrip with pictures of an Asian male, possibly Bruce Lee, conducting martial arts while wearing a martial arts costume.  The control t-shirt was similar to the test shirt, but the picture on the control t-shirt was edited to remove material objectionable to the plaintiff.  As with the test shirt, the picture on the control depicted an Asian male conducting martial arts and dressed in a martial arts costume.

4.      The survey interviewed representative respondents who plan to purchase graphic or screened t-shirts and who plan to shop at Urban Outfitters or Target within the next six months. Each respondent saw one t-shirt, and then answered a series of questions to measure three types of confusion:

      i.     Confusion as to source:  The survey asked respondents who they think made or put out the t-shirt.  Follow up questions asked respondents why they answered the way they did.

      ii.    Confusion as to endorsement:  The survey asked whether respondents believe that someone endorsed the t-shirt, and if so, who provided the endorsement.  Follow up questions asked why they answered the way they did.

      iii.   Confusion as to permission or approval:  The survey also asked whether

- 2 -

respondents believe that the maker of the t-shirt received permission or approval from someone to make or put out the t-shirt, and if so, who provided permission or approval.  Follow up questions asked why they answered the way they did.

5.      The survey was designed to be consistent with generally accepted principles, and to retain certain elements from the survey used by an expert in another matter involving t-shirts licensed by A.V.E.L.A. and bearing an image identical or similar to the musician Bob Marley.  My survey included questions measuring confusion as to source and as to permission or approval, as well as questions relevant to false endorsement.

6.      As I describe in this report, the survey measured confusion as to source, endorsement, or permission or approval regarding Bruce Lee or entities associated with Bruce Lee.  The data indicate the following:

    i.    Source:  Confusion as to source measures whether respondents believe Bruce Lee or an entity associated with Bruce Lee made or put out the t-shirt.  Among all respondents, confusion was 4.1% in the test cell, and 1.1% in the control cell, for a net level of 3.0%.[1]  Confusion as to source among Urban Outfitters shoppers was similar, measuring 3.3% in the test, 1.2% in the control, and 2.1% net.

    ii.    Endorsement:  Confusion as to endorsement measures whether respondents believe that Bruce Lee or an entity associated with Bruce Lee endorsed the t-shirt. Among all respondents, confusion was 9.0% in the test cell and 1.5% in the control cell, for a net confusion level of 7.5%.  Among Urban Outfitters shoppers, confusion was 11.2% in the test cell, 1.8% in the control cell, and 9.4% net.

    iii.    Permission or Approval:  Confusion as to permission or approval measures whether respondents believe that the makers of the t-shirt received permission or approval from Bruce Lee or an entity associated with Bruce Lee. Among all respondents, confusion was 22.9% in the test cell, 15.0% in the control cell, and 7.9% net.  Among Urban Outfitters shoppers, confusion was 23.8% in the test

---

[1] Net confusion is calculated by subtracting the control cell from the test cell.

cell, 16.9% in the control cell, and 6.9% net.

iv.    <u>Total Confusion</u>:  One measure for total confusion follows Dr. Jay's calculations, measuring the percentage of respondents who believe that Bruce Lee or an entity associated with Bruce Lee made or provided permission or approval to the makers of the t-shirt.  (Dr. Jay called this confusion as to "source or sponsor".)  Among all respondents, the percentage of respondents who believe that Bruce Lee, or an entity associated with Bruce Lee, made or provided permission or approval was 25.5% in the test cell, 15.4% in the control cell, and 10.1% net.  Among Urban Outfitters shoppers, the percentage was 25.8% in the test cell, 16.9% in the control cell and 8.9% net.   When endorsement is included in this calculation so that it measures the percentage of respondents who believe that Bruce Lee or an entity associated with Bruce Lee made, endorsed, or provided permission or approval, the net numbers are 12.0% among all respondents or 11.6% among Urban Outfitters shoppers.

7.    After reviewing certain background information, I will discuss the survey and my findings in detail.


**My Qualifications**

8.    I am the owner and President of MMR Strategy Group ("MMR"), a marketing research and consulting firm, and have expertise in research, surveys, and marketing.

9.    For approximately 35 years,[2] MMR has provided marketing research and consulting, consisting primarily of the design, execution, and analysis of thousands of surveys, as well as expertise related to marketing and strategy. Our experience includes many surveys used in intellectual property litigation.

10.    Over our history, my firm has served such well-known organizations as Alberto-Culver, several regions of the American Automobile Association, Denny's, Farmers Insurance Group,

---

[2] The firm was known as Marylander Marketing Research until approximately November 2009.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

Goodyear Tire & Rubber Company, Hewlett-Packard, Nestlé USA, Inc., Ore-Ida Foods, Smart & Final Stores, the Hollywood Bowl, the UCLA School of Public Health, Universal Studios, and many other organizations.

11.     My company and I have conducted research for studies involving a variety of products sold in consumer markets, and also regularly conduct research for retailers.

12.     I received a Bachelor of Science degree in engineering from the Technological Institute at Northwestern University in 1985, and Master of Business Administration and Doctor of Business Administration degrees from the Harvard Graduate School of Business Administration in 1991 and 1996.  At Harvard, I received my MBA with highest distinction as a Baker Scholar and was a Dean's Doctoral Fellow, writing 14 publications on marketing and strategy, including best-selling teaching materials.

13.     I have taught marketing and strategy for executive groups and executive MBA programs, and, for my research, I have won awards from institutions including The Institute for the Study of Business Markets at Penn State University, and Harvard University.

14.     In terms of professional experience, I have been a marketing and strategy consultant at The Boston Consulting Group, Senior Vice President at a publicly traded data processing company that is now a division of Intuit, Division President at a media services company, and Vice President responsible for marketing and strategy at a national financial services company.  I also served as the West Coast Practice Leader of Monitor Executive Development, a division of Monitor Group, an international strategy consulting firm, where my responsibilities included developing curriculum and serving as lead faculty for executive education programs in marketing and strategy.

15.     I am a member of the American Marketing Association and the Marketing Research Association.  My firm is a member of the Council of American Survey Research Organizations and the International Trademark Association.  I have been on the editorial board of the *Journal of Business to Business Marketing* since 1994, and am a member of *The Trademark Reporter* Committee at the International Trademark Association.  I regularly consult with clients regarding marketing, research, and strategy, and also address conferences and groups on the same issues.

- 5 -

My public speaking includes addressing law firms and bar associations on the use of research and surveys in intellectual property litigation. In 2008, I was a speaker at the American Marketing Association's annual marketing research conference. I have co-authored an article published in the *Intellectual Property Law Newsletter* of the American Bar Association, Intellectual Property Law Section, on the use of surveys in intellectual property matters.

16. Over my career, I have personally designed, overseen, and analyzed many hundreds of research studies. I have also provided expertise in marketing, branding and consumer behavior to many clients in a variety of industries on topics such as new products, market and consumer segmentation, and pricing. A copy of my curriculum vitae and litigation expert witness experience is attached as Exhibit 1.

## Compensation and Materials Reviewed

17. The compensation charged by my firm in this matter is $72,000 for the survey research and related activities, such as research design and writing this report. After this expert report, I charge $550 per hour for additional activities, if any, with certain daily minimums for testimony.

18. For purposes of this report, I have reviewed the following items and/or types of items:

      i.   Legal documents, such as the Second Amended Complaint, dated June 25, 2010.

      ii.   Websites relevant to this matter, such as those belonging to Urban Outfitters (www.UrbanOutfitters.com), Target (www.Target.com), and other retailers.

      iii.   The results of Internet searches on search engines such as Google for terms relevant to this matter, such as "Bruce Lee t-shirt," "filmstrip t-shirt," and other terms as well.

      iv.   The t-shirts sold by Urban Outfitters and Target.

      v.   A phone conversation with A.V.E.L.A executives, including Leo Valencia and Melissa Woo Allen (General Counsel). I have also spoken with David Gerber, outside counsel for A.V.E.L.A.

      vi.   Websites of distributors and resellers who sell, re-sell, and/or distribute graphic or screened t-shirts mentioned in the survey.

- 6 -

      vii.   <u>Materials</u> relevant to prior litigation involving A.V.E.L.A.

19.    I also reviewed published literature and cases relevant to the issues and theories in this matter, the most relevant of which are cited in this report.  In addition, I rely on my knowledge and experience in fields such as surveys and marketing research.

20.    The next section describes the t-shirt survey.

## Description of the T-Shirt Survey

21.    My survey measured the impressions and attitudes formed by respondents who viewed the filmstrip t-shirt.  All aspects of the survey were designed and carried out under my supervision.

22.    The design of my survey, including much of the screening criteria and certain survey questions, was based in part on a format used by Dr. Deborah Jay[3] in another litigation matter involving t-shirts possibly bearing the image of Bob Marley.  Dr. Jay states on page 1 of her report that she was retained by counsel for the Plaintiffs in that matter for a survey measuring "… whether potential purchasers of graphic or screen t-shirts were likely to believe that the heirs, estate, or agents of Robert Nesta Marley ('Bob Marley') are the source or the sponsor of, or are affiliated with, A.V.E.L.A. t-shirts bearing Bob Marley's image."

23.    In the Jay survey, respondents who passed certain screening criteria were shown either the t-shirt depicting an image similar to Bob Marley, or a control version of the same t-shirt.  After viewing the t-shirt, respondents were asked a series of questions regarding their beliefs about the t-shirt.  The judge's order discusses the methods and findings from the Jay survey.[4]  My survey generally follows the Jay format, but makes changes where appropriate to reflect the specifics of this case.

24.    The format for my survey is consistent with the Eveready format for likelihood of

---

[3] That report is entitled "Clothing Survey Report" and was signed August 19, 2009.  I believe it was filed in the matter of *Fifty-Six Hope Road Music, Zion Rootswear, and Robert Marley Foundation v A.V.E.L.A., Leo Valencia, X One X Movie Archive, JEM Sportswear, and Central Mills* (US District Court, District of Nevada).

[4] See Ruling in *Fifty-Six Hope Road Music, Zion Rootswear, and Robert Marley Foundation v A.V.E.L.A., Leo Valencia, X One X Movie Archive, JEM Sportswear, and Central Mills* (US District Court, District of Nevada). Dated February 25, 2010.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

confusion tests. Eveready is frequently acknowledged as appropriate to use when measuring confusion involving well-known marks. For example, a recent article in *The Trademark Reporter* stated, "In cases involving strong marks, the Eveready test should be considered the gold standard."[5] In the Eveready format, the respondent sees a single stimulus to see whether it calls to mind the other mark. In other words, the respondent, "...familiar to some extent with the one party's mark, is presented with the other party's goods alone."[6]

25.     The plaintiffs maintain that Bruce Lee was a well-known celebrity. In paragraph 27 of the Second Amended Complaint, they state that, "LEE is, without question, the greatest icon of martial arts cinema and is, unquestionably, a key figure in American popular culture ..." They also state in paragraph 28 that, "LEE was known throughout the world and to his peers as not only an amazingly gifted athlete, but as a talented actor whose albeit handful of films still left behind an indelible impression on Hollywood and modern cinema." Paragraph 34 of that Complaint states that, "As a result of BLE's extensive marketing and sales efforts with regard to the LEE Intellectual Property, coupled with the intense fame and celebrity attached to LEE, consumers readily identify and / or recognize the LEE Intellectual Property as a symbol of LEE's iconic persona."

26.     Because Bruce Lee was so well-known, Eveready is the preferred research method. My survey tests an image that may be Bruce Lee and is displayed on a t-shirt, as well as text on hang tags attached to the t-shirt.

27.     The Second Amended Complaint specifically references endorsement, so my survey included questions to measure endorsement, following the court's suggestion in a different recent matter, Cairns v. Franklin Mint. The Cairns case involved items bearing the likeness of a well-known deceased celebrity (Princess Diana). The survey provided in that matter measured, among other items, whether respondents believed the manufacturer needed to get permission to make the product in question. The survey was criticized by the court as not measuring whether

---

[5] Jerre B. Swann, "Likelihood of Confusion Studies and the Straitened Scope of Squirt," *The Trademark Reporter*, May-June, 2008, Vol. 98, pp. 746-748.
[6] See *Elizabeth Taylor Cosmetics Co. v. Annick Goutal*, S.A.R.L., 673 F.Supp. 1238 (S.D.N.Y.1987)

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

respondents believed the product was endorsed by the celebrity.  Comments from the court suggest that the survey should have measured endorsement:  "Whether or not permission is necessary is a separate question from endorsement and sheds no light on whether the respondent believed the product was endorsed by the plaintiffs."[7]

28.     The Second Amended Complaint in this case refers to two retailers:  Urban Outfitters and Target.  I understand that these two retailers sold at least two t-shirts possibly showing images of Bruce Lee.[8]  The t-shirt sold by Target was tested in a relatively small number of Target stores before it was removed from the shelves.  During the time it was displayed, only 140 t-shirts were sold, all in Target stores and none online.  In comparison, the t-shirt sold by Urban Outfitters possibly bearing the image of Bruce Lee[9] was both displayed in store and on the Urban Outfitters website (at www.UrbanOutfitters.com).  A total of 4,980 units were sold in Urban Outfitters stores, while 730 were sold online at the Urban Outfitters website.

29.     In total, 5,850 shirts were sold by Target and Urban Outfitters, of which approximately 98% were sold by Urban Outfitters. Consequently, my survey tested the Urban Outfitters shirt rather than the Target t-shirt.  That t-shirt, the "filmstrip t-shirt," is shown in Exhibit 2.  Testing both shirts was not necessary given the sales numbers described earlier and the fact that Target carried the t-shirt only as a test item.

30.     The next section describes in detail my research methods for the survey.

---

[7] *Lord Simon Cairns vs. Franklin Mint Company*, Opinion from the U.S. Court of Appeals for the Ninth Circuit, D.C. No. CV-98-03847-FMC, 2002.

[8] I understand that there were also other t-shirts produced with images potentially objectionable to the Plaintiff, but that a settlement has been reached for at least one of those items.

[9] I have been told that this t-shirt may show images depicting another actor after the death of Bruce Lee.  I do not know whether the image on the front of the test shirt sold by Urban Outfitters is actually Bruce Lee or another actor who looks like Bruce Lee. Whether it is or is not Bruce Lee, the survey methods would be the same.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

## Methodology for the T-Shirt Survey

31.     I conducted my survey among respondents representative of consumers of graphic and screened t-shirts.  Following the Jay survey where appropriate, respondents were qualified by criteria that included the following:

    i.    Geography:  Dr. Jay designed her survey to have 33% of respondents from the South, and about 20% each from the Northeast, Midwest, and West.[10]  My survey was conducted in 16 locations, with quotas set so that the percentage of respondents from each region would match the United States Census (which approximately matches the Jay survey).  Respondents for my survey were selected to provide 37% from the South, 18% from the Northeast, 22% from the Midwest, and 23% from the West;  these percentages exactly match the Census.

    ii.   Shopping at Target or Urban Outfitters:  For her survey, Dr. Jay qualified consumers as planning to shop at one of three retailers where A.V.E.L.A. t-shirts bearing an image that may be Bob Marley are sold.  Similarly, my survey qualified respondents as planning to shop during the next six months at either of the two retailers named in the Second Amended Complaint as locations where A.V.E.L.A. t-shirts bearing an image that may be Bruce Lee were sold, namely Target or Urban Outfitters.

    iii.  Age:  Respondents for my survey were qualified as either age 16-30 or 31-60 years old.  As shown by Exhibit 3, Urban Outfitters has stated on their website and in financial documents that their target consumer is approximately age 18-30.  Although this is their target, it is possible that some shoppers outside this age range may shop for or buy this merchandise for themselves or others, so the sample for my survey was qualified as 80% age 16-30, and 20% age 31-60.[11]  The Jay survey used the same age ranges, but had slightly more respondents in the 31-60 age range.  The demographics I used are also consistent with the

---

[10] These geographies are used by the United States Census to divide the country into four regions.

[11] Without any additional information, I assumed that Target's shoppers for similar merchandise are of similar ages.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

defendant's understanding of the age range of consumers of this merchandise, based on a conversation with Leo Valencia.

    iv.   <u>Gender</u>:  Respondents for my survey were qualified to provide a respondent base that is about two-thirds male, and one-third female. My understanding is that the shirt tested was purchased by the men's department, but Urban Outfitters carries clothes for both men and women, and it is possible that shoppers or buyers for the shirt included women, either shopping for themselves or for others.  These ratios match the Jay survey, and also are consistent with Leo Valencia's understanding of the category.

    v.   <u>Purchasing graphic or screened t-shirts</u>:  Again following the Jay survey, respondents for my survey were screened as planning to purchase graphic or screened t-shirts in the next 6 months.

32.    Respondents for the survey were also qualified by other criteria, such as participation in other surveys, living in the area of the mall, and not working in certain disqualifying occupations.  Because my control t-shirt showed pictures I located online, the criteria for disqualifying occupations included a screen to exclude potential respondents who work as a licensor, licensee, or other provider of pictures or images.

33.    I gathered data for my survey by in-person interviews conducted at malls.  This mode of data gathering matched the mode of sales for more than 87% of the t-shirts sold by Urban Outfitters.  The survey was administered by an interviewer who typed responses into a computer program in a process called Computer Assisted Personal Interviewing.

34.    After qualification, survey respondents were randomly assigned to one of two "cells" or groups.  The t-shirts viewed by each cell are shown in Exhibit 2.  Both cells saw the t-shirt in the same condition in which it was displayed at retail, including two hang tags.  (One hang tag identifies Urban Outfitters, and provides information such as price.  The other hang tag identifies A.V.E.L.A. and is required by A.V.E.L.A.'s licensing agreement to be attached to the t-shirt.)

35.    Cell 1 was the test cell, where respondents saw a copy of the t-shirt actually sold by Urban Outfitters.  Cell 2 was a control cell, where respondents saw a t-shirt identical to the test

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

shirt, except the control shirt was altered in three respects:

    i.    The pictures in the filmstrip showed multiple pictures of an Asian male, who was not Bruce Lee, conducting martial arts while wearing a martial arts costume.

    ii.    The hang tag for the control t-shirt was edited to remove the words "Bruce L. Filmst" from the hang tag used on the test.

    iii.    Chinese writing on the front of the test t-shirt was removed. I understand that the writing describes events associated with Bruce Lee.

36.    In all other respects, the control t-shirt was highly similar to the test t-shirt. The control contains the same number of pictures, the pictures are black and white, the images are somewhat grainy, and the filmstrip has a similar look and feel to the test t-shirt, including a ragged background on the bottom of the image.

37.    The control allows the survey to measure the differences that might have occurred if the t-shirt had no images from Bruce Lee films and if the hang tag did not include a reference to "Bruce L. Filmst." The control measures this difference by removing all potentially objectionable material from the test t-shirt.

38.    Exhibit 4 provides copies of the screening and survey questionnaires. Data gathering occurred from May 4, 2012 to May 14, 2012. The survey was conducted at 16 locations, distributed across four regions of the United States, in these markets:

    i.    <u>Northeast</u>: Philadelphia, South New Jersey, Boston, New York Metro

    ii.    <u>South</u>: Atlanta, Dallas, Jacksonville, Miami, Tampa

    iii.    <u>West</u>: Los Angeles, Tucson, Portland

    iv.    <u>Midwest</u>: Minneapolis, Chicago, Cleveland, Kansas City

39.    Following the example of the Jay survey, my survey qualified respondents as shopping at the retailers mentioned in the Second Amended Complaint as those retailers where filmstrip t-shirts were sold, namely Urban Outfitters and Target. Wherever possible, I selected locations that had both Urban Outfitters and Target stores nearby.

40.    The specific t-shirt tested in my survey was sold only at Urban Outfitters, but Urban Outfitters shoppers are more difficult to locate than Target shoppers. In the United States, Urban

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

Outfitters operates about 140 stores, compared with more than 1,750 Target locations.  To ensure sufficient interviews to analyze the results either for all respondents, or for only those respondents who shop at Urban Outfitters, I used quotas during data gathering.

41.     Across all locations, quotas were assigned to balance responses across age, gender, and region to match the qualification criteria described earlier.  Instructions for interviewers and supervisors are included in Exhibit 5.  Before any interviews were conducted, I personally trained supervisors at all locations.

42.     After respondents answered qualification questions matching the criteria listed earlier in this report, interviewers proceeded to the main survey questionnaire.  At the beginning of my survey, respondents were given an initial instruction, then were handed either the test or control t-shirt and told:

> "Please look at this t-shirt the way you normally do when you are clothes shopping. (PAUSE)  Take as long as you would like, and then tell me when you are finished. (PAUSE)"

43.     After they finished, respondents were told:

> "Now, I would like to ask you a few questions about this t-shirt.  (PAUSE)  Before I begin I would like to assure you that there is no right or wrong answer.  (PAUSE)  If you do not know the answer to a question or do not have an opinion, please say so.  (PAUSE) Please do not guess."

44.     The first three questions measured confusion as to source.  Question 1a asked, "Who do you think made or put out this particular t-shirt?"  Question 1b asked, "What makes you think this?" Question 1c asked, "Any other reason?" The responses to Questions 1a, 1b, and 1c were open-ended, provided in each respondent's own words.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

45.    The next series of questions measured false endorsement.  Question 2a asked respondents,

> "Next, I am going to read you a question that has three answer choices.  (PAUSE) Please allow me to read the whole question before answering.  (PAUSE)  After I am done, if you want me to read the question again, just ask me.  (PAUSE)  Now, with respect to this particular t-shirt, do you think...?
>
>> That someone endorsed this particular t-shirt,
>>
>> That no one endorsed this particular t-shirt,
>>
>> Do you have no opinion?"

46.    Respondents who answered that someone endorsed the t-shirt were asked Question 2b, "Who do you think endorsed this particular t-shirt?"  All respondents except those who answered "no opinion" where then asked Question 2c, "What makes you think this?" and Question 2d, "Any other reasons?"  Responses to Questions 2c and 2d were also open-ended.

47.    The next set of questions measured confusion as to permission or approval, using the format from the Jay survey.[12]  Question 3a asked,

> "This question has three answer choices.  (PAUSE)  Once again, please allow me to read the whole question before answering.  (PAUSE)  Now, with respect to the makers of this particular t-shirt, do you think...?
>
>> That they did receive permission or approval from someone to make or put out this particular t-shirt,
>>
>> That they did not receive permission or approval from someone to make or put out this particular t-shirt,
>>
>> Do you have no opinion?"

---

[12] The Jay survey asked respondents whether they thought that the makers of the t-shirt make or put out something besides t-shirts, and if so, what else do they make or put out.  The data from this question were not used in Dr. Jay's summary measure of confusion, and she mentioned numerous times at deposition (taken November 19, 2009) that the results of this question were not clearly supportive for or against her findings about confusion.  The question appears less relevant than endorsement, which was not measured in the Jay survey.  Not all Eveready surveys must include questions about other products made or put out.  (See *Starbucks U.S. Brands and Starbucks Corporation v. Marshall S. Ruben*, TTAB 2006, or *McCarthy on Trademarks and Unfair Competition*, updated March 2009, 32:174, "Tests of properly conducted survey – Survey formats – Eveready confusion format".)

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

48.     Respondents who answered "did receive" were asked <u>Question 3b</u>, which asked, "Who do you think gave their permission or approval for this particular t-shirt to be made or put out?" All respondents except those who answered "no opinion" where then asked <u>Question 3c</u>, "What makes you think this?" and <u>Question 3d</u>, "Any other reasons?"  Responses to Questions 3c and 3d were open-ended.

49.     The survey included a number of quality control and validation checks, including the following:

     i.     A pilot test was conducted in Ontario, California, where interviews were conducted under the direct observation of a staff member from MMR.

     ii.     Supervisors were required to participate in a briefing, and interviewers were required to conduct practice interviews before starting actual interviews.

     iii.     The order of responses for the closed end questions (2a and 3a) were rotated to reduce the possibility of order bias, which occurs if respondents are more likely to select a response in a particular position.  Respondents saw responses to those questions in essentially random order, with "no opinion" always presented last.

     iv.     During qualification, qualifying questions were hidden among other, non-qualifying questions.

     v.     Respondents were required to provide certain information twice for confirmation. Qualifying question S1 asked about age at the beginning of the survey, as did question 101 at the end of the survey.  Similarly, questions S2 and 102 asked about gender.  The responses for age and gender were required to match.

     vi.     The survey was conducted under double blind conditions, where neither the interviewers nor the respondents knew the true purpose of the research.

50.     In some types of surveys, it is common procedure to validate a percentage of the interviews, confirming key elements such as whether the interviews actually took place and whether the respondent was indeed qualified.  Some sources discuss validating about 15% of responses.[13]  As part of the validation, a third party, Interviewing Service of America (of Van

---

[13] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, Updated March, 2009,

Nuys, California) called respondents from the survey to confirm that the interview had taken place and verify key qualification criteria.  A copy of the validation questionnaire is listed in Exhibit 6.  In total, about 68% of interviews were validated, and no suspicious or unusual patterns were revealed by the validations.

51.     From the original base of interviews completed, 12 (2%) were removed during validation, leaving a final database consisting of 534 interviews, including 267 test interviews and 267 control interviews.  The database is larger than the sample size of 509 interviews in the Jay survey.  Of the 534 interviews, 317 were from respondents who planned to shop at Urban Outfitters (and possibly Target as well) in the next six months, while the remaining interviews are from consumers who shop at Target but not Urban Outfitters.

52.     The next section describes the findings from the data gathered in the survey.


**Findings from the Survey**

53.     Exhibit 7 provides all responses to all questions for each respondent.  Exhibit 8 lists the codes used to analyze responses from open-ended questions in the survey.  Those codes were assigned to verbatim responses from the open-ended questions to reflect themes inherent in all comments.  Some verbatim responses may reflect more than one theme, in which case they were assigned more than one code.

54.     Exhibit 9 presents cross tabulation tables from the data analysis. The cross tabulations describe results by region (Table 1 of Exhibit 9), age (Table 2), and gender (Table 3), showing that the demographics of the respondent base matches the targets described earlier closely for both the test and control cells.

55.     The data from Exhibits 7 and 9 is presented in summary form in the remainder of this section, which provides summary tables and also shows examples of some verbatim responses for open-ended questions.  The summary tables show test and control responses.

56.     In the survey, confusion is measured by the percentage of respondents who mentioned any of the following themes:

32:170.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

     i.    <u>Confusion as to source</u>:  The percentage of respondents mentioning Bruce Lee, an entity related to Bruce Lee (such as his heirs, manager, or family), or the person on the t-shirt in response to the question asking who made or put out the t-shirt.

    ii.   <u>False endorsement</u>:  The percentage of respondents who said they believe someone provided endorsement for the t-shirt, and mentioning Bruce Lee, or an entity related to Bruce Lee, as the source of the endorsement.

   iii.   <u>Confusion as to permission or approval</u>:  The percentage of respondents who said they believe someone provided permission or approval to make or put out the t-shirt, and mentioning Bruce Lee, an entity related to Bruce Lee, or the person on the t-shirt, as providing the permission or approval.

57.    The coding method described above to measure confusion as to source and confusion as to permission or approval match the method used by Dr. Jay.  It is conservative from the plaintiff's point of view, counting as confused any respondent who mentions Bruce Lee, an entity related to Bruce Lee, or the person on the t-shirt.  The inherent assumption is that a mention of the person on the t-shirt refers to Bruce Lee, even if the respondent does not identify Bruce Lee by name.  The coding for endorsement is similar but does not count responses as confused who refer generally to the person on the t-shirt; as the court in Cairns v. Franklin Mint pointed out, false endorsement must identify whether the respondent believes the product was endorsed by a specific plaintiff.[14]  In other words, confusion as to endorsement must refer to an identifiable individual.

58.    Regarding confusion as to source, Question 1a asked respondents who they think made or put out the t-shirt.  The data for Question 1a are summarized below in Table A below, for both the test and control t-shirts.

---

[14] *Lord Simon Cairns, et al.vs. Franklin Mint et al,* CV 98-3847 FMC (BQRx), U.S. District Court, Central District Of California, 07 F. Supp. 2d 1212; 2000.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

| Q.1a  Who do you think made or put out this particular t-shirt? | Table A: Confusion as to Source % of respondents mentioning theme in Question 1a for... | | | | | |
| | Urban Outfitters and Target Shoppers | | | Urban Outfitters Shoppers | | |
| | Test | Control | Net | Test | Control | Net |
| **Bruce Lee or Bruce Lee related** | **4.1%** | **1.1%** | **3.0%** | **3.3%** | **1.2%** | **2.1%** |
|    Bruce Lee | 1.1% | 0.7% | 0.4% | 1.3% | 0.6% | 0.7% |
|    Bruce Lee related (family, estate, right holders, etc.) | 3.0% | -- | 3.0% | 2.0% | -- | 2.0% |
|    The person on the shirt | -- | 0.4% | -0.4% | -- | 0.6% | -0.6% |
| All other retailer mentions | 23.2% | 13.9% | 9.3% | 24.5% | 13.9% | 10.6% |
| Urban Outfitters | 18.0% | 22.5% | -4.5% | 21.2% | 26.5% | -5.3% |
| Avela | 12.7% | 15.4% | -2.7% | 13.9% | 13.9% | 0.0% |
| Target | 9.0% | 9.7% | -0.7% | 7.3% | 11.4% | -4.1% |
| Other martial arts or martial artist mentions | 2.6% | 3.0% | -0.4% | 3.3% | 2.4% | 0.9% |
| All other mentions | 10.5% | 10.1% | 0.4% | 9.9% | 12.0% | -2.1% |
| Don't know/No opinion | 22.8% | 25.1% | -2.3% | 19.9% | 19.9% | 0.0% |

59.     As can be seen in Table A, among all respondents, the percentage mentioning Bruce Lee is 1.1% in the test cell, while 3.0% of respondents mentioned an entity related to Bruce Lee. Percentages are similar among Urban Outfitters shoppers.  The level of net confusion as to source is 3.0% among all respondents, and 2.1% among Urban Outfitters shoppers.

60.     A much larger percentage of respondents mentioned other retailers.  Among all respondents, other retailers were mentioned by 23.2% of test cell respondents and 13.9% of control cell respondents;  among Urban Outfitters shoppers, other retailers were mentioned by 24.5% of test cell respondents and 13.9% of control cell respondents.  Retailers mentioned in this category include Hot Topic, Walmart, Old Navy, Gap, American Eagle, Abercrombie & Fitch, and others.

61.     The specific retailer mentioned most frequently was Urban Outfitters, which was mentioned by 18% of test cell respondents and more than 22% of control cell respondents. Examples of verbatim comments from the test cells referencing Urban Outfitters in response to Question 1a include the following:[15]

---

[15] Verbatim responses are included with the respondent identification number first.  Comments are shown as they were typed during the interview.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

    i.    ID #1015: "the tag says urban outfitters"

    ii.    ID #2018: "It looks like Urban Outfitters put this out on their own. I didnt realize they had a line of clothing. Their name is on the tag."

    iii.    ID # 5001: "maybe Urban Outfitters did this"

    iv.    ID # 5011: "This actually looks like Urban Outfitters."

    v.    ID # 5014: "Avela is the name on the tag. It looks like an urban outfitters shirt"

    vi.    ID # 7003: "urban outfitters"

62.    Target was also mentioned frequently.  Examples of verbatim comments from the test cells referencing Target in response to Question 1a include the following:

    i.    ID #5008: "I think Target made this shirt."

    ii.    ID #7028: "I think target made it"

    iii.    ID #7030: "I think Target put out this shirt."

    iv.    ID #9017: "target"

    v.    ID #15014: "i wouls say it looks like target shirt"

63.    Verbatim comments from the test cells referencing Bruce Lee or entities related to Bruce Lee in response to Question 1a include the following:

    i.    ID #5044: "bruce lee's estate"

    ii.    ID #6022: "BRUCE L. FILMS."

    iii.    ID #9027: "The Bruce lee meorabilia"

    iv.    ID #9032: "brue lee."

    v.    ID #15017: "bruce lee."

    vi.    ID #16005: "bruce lees producers."

    vii.    ID #16019: "I guess somebody representing Bruce Lee's movies."

    viii.    ID #16033: "Bruce Lee.  I mean not Bruce Lee, you know, but someone of his relation."

64.    The next two questions followed up on Question 1a.  Question 1b asked "What makes you think this?" and Question 1c asked "Any other reasons?" The responses to these questions indicate that even among respondents who were aware that the figure on the shirt may be Bruce

- 19 -

Lee, respondents varied in their impression as to whether he would be involved in making or putting out the t-shirt. In other words, some respondents could be aware of Bruce Lee's possible presence on the t-shirt, but see another entity or person as the source of the t-shirt.

65.     Examples of verbatim comments for Questions 1b and 1c for test cell respondents who referenced Bruce Lee or entities related to Bruce Lee in response to Questions 1a, 1b, or 1c include the following:

| Respondent ID # | Q1a. Who do you think made or put out this particular t-shirt? | Q1b. What makes you think this? | Q1c. Any other reasons? |
|---|---|---|---|
| 1015 | the tag says urban outfitters | the size of the t-shirt ,every other store has fitting shirts.the fact that it has bruce lee and chinese writings says it appeals to the minority group. | nothing else really |
| 5023 | China | Because of Bruce Lee | no other reasons |
| 5044 | bruce lee's estate | because bruce lee is dead but his picture is on it | no there are no other reasons |
| 6022 | BRUCE L. FILMS. | BECAUSE I SAW THAT ON THE TAG. | No |
| 7012 | someone from asia | the writing and the art of fighting on the front | bruce lees films on the tag because bruce lee is on the front |
| 9027 | The Bruce lee meorabilia | Because Bruce Lee is on it. | No |
| 9032 | brue lee | hes all over the shirt | no other reasons |
| 14037 | Target | That it's a Bruce Lee's shirt. | They always have super hero and that kind of celebrity shirts. |
| 15014 | i wouls say it looks like target shirt | the brand of a sort of bruce lee picture on it | i think i would see this in target |
| 15017 | bruce lee | because hes featured on the shirt | no nothing else |
| 16005 | bruce lees producers | because bruce lee is on it | somebody puts out his stuff not by himself because hes too busy |
| 16018 | I have no idea. | I could be hot topic. | Because there is bruce lee on the front. |
| 16019 | I guess somebody representing Bruce Lee's movies. | Because it has a bunch of film clips on it of Bruce Lee. | No other reasons. |
| 16033 | Bruce Lee. I mean not Bruce Lee, you know, but someone of his relation. | Because he is on the teeshirt. | Nope |

66.     Question 2a asked whether someone or no one endorsed this particular t-shirt. The data from Question 2a are provided in Table 28 of Exhibit 9 and summarized in Table B below.

- 20 -

| | Table B:  Confusion as to False Endorsement % of respondents selecting response in Question 2a for... | | | |
| Q.2a  Now, with respect to this particular t-shirt, do you think ... | Urban Outfitters and Target Shoppers | | Urban Outfitters Shoppers | |
| | Test | Control | Test | Control |
|---|---|---|---|---|
| That someone endorsed this particular t-shirt | 39.3% | 32.6% | 37.1% | 35.5% |
| That no one endorsed this particular t-shirt | 15.4% | 18.0% | 16.6% | 17.5% |
| No opinion | 45.3% | 49.4% | 46.4% | 47.0% |

67.     As Table B shows, among all respondents, 39.3% of test cell respondents think that someone endorsed the t-shirt, while 32.6% of control cell respondents think that someone endorsed the t-shirt.  Among Urban Outfitters shoppers, the levels are 37.1% test and 35.5% control.

68.     The responses to Question 2b, which asked who endorsed the t-shirt, were open-ended. The themes reflected in each comment are described in Table 29 of Exhibit 9, and summarized below in Table C.

| | Table C: Confusion as to False Endorsement % of respondents[16] mentioning theme in Question 2b for... | | | | | |
| Q.2b.  Who do you think endorsed this particular t-shirt? | Urban Outfitters and Target Shoppers | | | Urban Outfitters Shoppers | | |
| | Test | Control | Net | Test | Control | Net |
|---|---|---|---|---|---|---|
| Bruce Lee or Bruce Lee Related | 9.0% | 1.5% | 7.5% | 11.2% | 1.8% | 9.4% |
| Bruce Lee | 3.4% | 1.1% | 2.3% | 4.6% | 1.8% | 2.8% |
| Bruce Lee related (family, estate, right holders, etc.) | 5.6% | 0.4% | 5.2% | 6.6% | -- | 6.6% |
| Urban Outfitters | 4.9% | 3.7% | 1.2% | 5.3% | 6.0% | -0.7% |
| All other retailer mentions | 4.5% | 1.9% | 2.6% | 4.6% | 2.4% | 2.2% |
| Other martial arts of martial artist mentions | 2.6% | 4.9% | -2.3% | 2.0% | 4.2% | -2.2% |
| Target | 2.6% | 1.1% | 1.5% | 0.7% | 0.6% | 0.1% |
| The person on the shirt | 2.2% | 4.1% | -1.9% | 2.0% | 6.0% | -4.0% |
| Avela | 0.4% | 1.9% | -1.5% | 0.7% | 1.2% | -0.5% |
| All other mentions | 4.1% | 6.4% | -2.3% | 4.0% | 4.8% | -0.8% |
| Don't know/No opinion | 9.4% | 7.1% | 2.3% | 6.6% | 8.4% | -1.8% |

---

[16] The bases (denominators) for these calculations are the total number of respondents in each column.  Excluding the person on the shirt from the confusion calculations for endorsement turns out to be a conservative approach from the defendant's point of view, because adding this code to the calculation would further lower the measured confusion.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

69.     As can be seen in Table C, among all shoppers, confusion as to endorsement by Bruce Lee or a related entity or person is 9.0% in the test cell, 1.5% in the control cell, and 7.5% net. Among Urban Outfitters shoppers, the figures are 11.2% test, 1.8% control, and 9.4% net.[17]

70.     Examples of verbatim comments from the test cells responding to question 2b and referencing Bruce Lee or an entity related to Bruce Lee as providing endorsement include the following:

     i.    ID #1015: "someone from a film industry to try to promote film sales, and for bruce lee. Also for fighting."

     ii.    ID #3001: "probably bruce lee's family"

     iii.    ID #5021: "The owners of Bruce Lee's brand"

     iv.    ID #6027: "BRUCE LEE ENDORCES THIS T-SHIRT"

     v.    ID #6031: "bruce lee and family"

     vi.    ID #9024: "Whoever owns the rights to the Bruce Lee movie."

     vii.    ID #14018: "The person who has the rights to Bruce Lee's pictures."

     viii.    ID #15018: "i think bruce lees image is still protected"

71.     As can be seen above, responses to Question 2b that referenced an entity or person related to Bruce Lee mentioned a variety of entities and people, such as Bruce Lee's family, people from the movie industry, holders of rights to Bruce Lee's movies, and holders of rights to Bruce Lee's image. For this question, I coded any comment as referring to the Plaintiff if the comment referenced any entity or person related to Bruce Lee.  (Questions could be raised about whether comments in 2b referring to some of these entities, such as Bruce Lee's family, should be counted as indicating an endorsement specifically from Bruce Lee.  If I excluded such comments from the calculation, the gross measures for endorsement would be lower.)

---

[17] As described earlier, the calculation of confusion as to endorsement reflects responses coded as Bruce Lee or related to Bruce Lee.  If the calculation included responses mentioning the person on the shirt, the net measure for confusion as to endorsement would decrease from 7.5% to 5.6% among all shoppers, and decrease from 9.4% to 5.4% among Urban Outfitters shoppers.  For reasons described earlier, I have used the higher numbers, which do not reflect responses coded as the person on the shirt.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

72.     Question 3a asked whether the makers of this particular t-shirt did or did not receive permission or approval from someone to make or put out this particular t-shirt.  The data from Question 3a are provided in Table 35 of Exhibit 9 and summarized in Table D below.

| Q.3a  Now, with respect to the makers of this particular t-shirt, do you think…? | Table D: Confusion as to Permission or Approval % of respondents selecting response in Q.3a for… | | | |
| | Urban Outfitters and Target Shoppers | | Urban Outfitters Shoppers | |
| | Test | Control | Test | Control |
| That they did receive permission or approval from someone to make or put out this particular t-shirt | 45.3% | 41.6% | 42.4% | 44.6% |
| That they did not receive permission or approval from someone to make or put out this particular t-shirt | 10.9% | 12.4% | 10.6% | 16.3% |
| No opinion | 43.8% | 46.1% | 47.0% | 39.2% |

73.     As can be seen in Table D, among all respondents in the test cell, 45.3% believe that permission or approval was received, compared with 41.6% in the control cell.  Among Urban Outfitters shoppers in the test cell, 42.4% believe that permission or approval was received, compared with 44.6% of Urban Outfitters respondents in the control cell.

74.     Confusion as to permission or approval is measured by the percentage of respondents who both believe that the makers received permission or approval from someone, and mentioned Bruce Lee, or an entity associated with Bruce Lee, in Question 3b as the source of the permission or approval.  Question 3b asked respondents who they think gave their permission or approval for this particular t-shirt to be made or put out.  The coding from Question 3b is described in Table 36 of Exhibit 9, and summarized below in Table E.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

| Q3b.  Who do you think gave their permission or approval for this particular t-shirt to be made or put out? | Table E: Confusion as to Permission or Approval % of respondents mentioning theme in Q3b for... | | | | | |
|---|---|---|---|---|---|---|
| | Urban Outfitters and Target Shoppers | | | Urban Outfitters Shoppers | | |
| | Test | Control | Net | Test | Control | Net |
| **Bruce Lee or Bruce Lee Related** | **22.9%** | **15.0%** | **7.9%** | **23.8%** | **16.9%** | **6.9%** |
| Bruce Lee | 1.1% | 1.1% | 0.0% | 0.7% | 1.8% | -1.1% |
| Bruce Lee related (family, estate, right holders, etc.) | 12.4% | 1.5% | 10.9% | 13.2% | 1.8% | 11.4% |
| The person on the shirt | 9.4% | 12.4% | -3.0% | 9.9% | 13.3% | -3.4% |
| Other martial arts or martial artist mentions | 1.5% | 1.5% | 0.0% | 1.3% | 2.4% | -1.1% |
| Urban Outfitters | 1.1% | 1.9% | -0.8% | 1.3% | 2.4% | -1.1% |
| Avela | 1.1% | 1.1% | 0.0% | 1.3% | 1.2% | 0.1% |
| All other retailer mentions | 0.4% | 1.1% | -0.7% | 0.7% | 1.8% | -1.1% |
| All other mentions | 9.7% | 12.4% | -2.7% | 6.0% | 8.4% | -2.4% |
| Don't know/No opinion | 8.6% | 10.1% | -1.5% | 7.9% | 12.7% | -4.8% |

75.     As can be seen in Table E, among all respondents, 22.9% of test cell respondent and 15.0% of control cell respondents provided an answer of Bruce Lee or an entity related to Bruce Lee, for a net measurement of 7.9%.  Among Urban Outfitters shoppers, the measured levels of confusion as to permission or approval are 23.8% test, 16.9% control, and 6.9% net.

76.     Examples of verbatim comments from the test cells referencing Bruce Lee or an entity related to Bruce Lee related in response to Question 3b include the following:

    i.     ID #3001:  "Probably the family. Bruce Lee's family."

    ii.     ID #5011:  "Whoever owns the right to Bruce Lee and his films."

    iii.     ID #5021:  "The owners of the Bruce Lee estate or copyright owners"

    iv.     ID #5044:  "bruce lee's estate, i dont know maybe his mom or sister or kids or wife."

    v.     ID #6030:  "who ever own the rights to the bruce lee's image."

    vi.     ID #8019:  "the family of bruce lee"

    vii.     ID #11018:  "the person in charge of bruce lee products."

    viii.     ID #14018:  "The person who has the rights to Bruce Lee's pictures."

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

    ix.    ID #15007: "bruce lee family"

    x.    ID #16019: "Whoever has control over Bruce Lee's image."

77.    In a belief pattern similar to prior questions, a number of respondents indicate in Question 3a that permission or approval was not received, and still reference Bruce Lee in response to Question 3c or 3d. Many of these respondents provide comments that indicated that they did not believe that the makers of the t-shirt were required to obtain permission, and sometimes they mention that they hold this belief because Bruce Lee has passed away. Verbatim comments from test cell respondents who think the makers of the t-shirt did not receive permission or approval to make or put out the t-shirt and who reference that Bruce Lee has passed away in response to Questions 3c and 3d include the following:

    i.    ID #1018: "if the picture is bruce lee he is dead so I dont think they had permission."

    ii.    ID #7027: "bruce lee passed away. w/e nothing"

    iii.    ID #9017: "Beacuse I think that they needed to get the rights from Bruce lee and I think he is dead."

    iv.    ID #14001: "Because Bruce Lee is dead so who did they get the approval from?"

    v.    ID #14019: "Because last time I checked dead people cannot say no. You only have to get their permission if they're a live."

    vi.    ID #16033: "Isn't Bruce Lee dead?"

## Discussion and Conclusions

78.    The survey I conducted and described in this report provides a series of measurements regarding the likelihood of confusion in this matter. Specifically, the survey measures three different types of confusion with regard to Bruce Lee or entities or people associated with Bruce Lee: confusion as to source, confusion as to endorsement, and confusion as to permission or approval.

79.    Table F below provides a summary measure reflecting the total level of confusion regarding who made or provided permission or approval for the t-shirt. On page 20 of her report,

Dr. Jay provides a similar summary measure, which she calls confusion as to "source or sponsor," based on the same two questions I have used for Table F. The table below excludes double counting by counting each respondent only once, and not counting a respondent more than once if they mentioned Bruce Lee or a related party in more than one question.

| | Table F:<br>Summary of Confusion Regarding Who Made or Gave<br>Permission or Approval for the Filmstrip T-Shirt[18] | | | | | |
|---|---|---|---|---|---|---|
| | Urban Outfitters and Target Shoppers | | | Urban Outfitters Shoppers | | |
| | Test | Control | Net | Test | Control | Net |
| Confusion as to source, from Q1a | 4.1% | 1.1% | 3.0% | 3.3% | 1.2% | 2.1% |
| Confusion as to permission or approval, from Q3a and Q3b | 21.3% | 14.2% | 7.1% | 22.5% | 15.7% | 6.8% |
| **Total confusion** | **25.5%** | **15.4%** | **10.1%** | **25.8%** | **16.9%** | **8.9%** |

80.     As can be seen by the table above, total confusion as to source or permission or approval, excluding double counting of respondents, among all respondents, is 25.5% in the test cell and 15.4% in the control cell, resulting in a net confusion measurement of 10.1%. Among Urban Outfitters shoppers, total confusion as to source or permission or approval is 25.8% in the test cell, 16.9% in the control, and 8.9% net.

81.     Some may argue that the summary measure should reflect all three types of confusion measured in the survey. (The counter argument is that Dr. Jay used a summary measure reflecting only confusion as to source or permission or approval, and that in this matter confusion as to endorsement may be a separate issue from source or permission/approval.) Table 44 in Exhibit 9 provides a summary calculation reflecting all three types of confusion measured in my survey, including source, endorsement, or permission or approval. Excluding double counting of respondents, total confusion as to source, endorsement, or permission or approval among all respondents is 28.1% in the test cell and 16.1% in the control cell, resulting in a net confusion measurement of 12.0%. Among Urban Outfitters shoppers, total confusion as to source, endorsement, or permission or approval is 29.1% in the test cell, 17.5% in the control cell, and 11.6% net.

---

[18] Tables I and J exclude double counting, and measured by responses referencing Bruce Lee or an entity or person related to Bruce Lee.

Expert Report of Dr. Bruce Isaacson
CASE NO. 1:10-CV-2333 LTS/AJP

82.     In summary, the types of confusion measured in my survey, and the net measurements, are provided in Table G below.

| Type of confusion with Bruce Lee or related entities | Table G: Net Measurements for Confusion | |
| --- | --- | --- |
| | Among all respondents | Among Urban Outfitters Shoppers |
| Confusion as to source | 3.0% | 2.1% |
| Confusion as to endorsement | 7.5% | 9.4% |
| Confusion as to permission or approval | 7.9% | 6.9% |
| Total confusion as to source or permission or approval | 10.1% | 8.9% |
| Total confusion as to source, endorsement, or permission or approval | 12.0% | 11.6% |

83.     The levels of net confusion range between 2.1% and 9.4% for the individual measures. For the total measures, the range is 8.9% to 10.1% for the calculation that matches the Jay survey and excludes endorsement, or 11.6% to 12.0% for the calculation that includes endorsement and does not match the calculation in the Jay survey.

84.     My understanding is that the measured level of confusion required to find a significant likelihood of confusion depends on the situation.  Professor McCarthy, surveying a variety of cases, suggests that, "Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of a likelihood of confusion."  He also states that, "Figures below 20% become problematic because they can only be viewed against the background of other evidence weighing for and against a conclusion of likely confusion."[19] My experience is that the net measurements for likelihood of confusion in Table G above are generally below levels that would be routinely considered significant.

---

[19] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, Updated March, 2009, 32:188 "Likelihood of confusion—Percentage figures in the cases—Evidence of a likelihood of confusion"1.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my belief.

Executed in Encino, California, on May 25, 2012

_____
Dr. Bruce R. Isaacson