UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                         :

BRUCE LEE ENTERPRISES, LLC,

                         :

               Plaintiff,

                         :

   - against -

                         :          OPINION & ORDER

A.V.E.L.A., INC. and LEO VALENCIA, an           10 CV 2333 (KMW)
individual, URBAN OUTFITTERS, INC., and  :
TARGET CORPORATION,

                         :

               Defendants.

-------------------------------------------------------------X

KIMBA M. WOOD, U.S.D.J.:

      Plaintiff Bruce Lee Enterprises, LLC ("BLE" or "Plaintiff") filed the above-captioned

lawsuit against A.V.E.L.A., Inc. ("AVELA"), AVELA's director, Leo Valencia ("Valencia"),

Urban Outfitters, Inc. ("Urban Outfitters"), and Target Corporation ("Target") (collectively,

"Defendants") seeking damages and equitable relief.  BLE, which claims to hold the publicity

rights to the image and likeness of the late martial artist Bruce Lee, alleges that Defendants

violated its intellectual property rights by the unauthorized manufacture and sale of t-shirts

bearing Bruce Lee's likeness.

      Currently before the Court is BLE's motion for summary judgment on Count I

(California right of publicity), Count III (unfair competition under the Lanham Act), Count IV

(common law unfair competition), Count V (unjust enrichment), and Defendants' two

counterclaims (interference with contractual relations and interference with economic

advantage).  [Dkt. No. 168].  Defendants' have cross-moved for summary judgment on Counts I,

III, IV, and V.  [Dkt. No. 179].  For the following reasons, the Court partially grants both parties'

cross-motions.

## I.  BACKGROUND

The parties appear to agree on few, if any, of the facts material to this dispute.  (*See* Pl.'s Resp. to Defs.' 56.1 Statement [Dkt. No. 215]; Defs.' Objs. to Pl.'s Evid. [Dkt. No. 212]).  The following background represents the parties' version of events based on their 56.1 submissions [Dkt. Nos. 176; 191] and the record evidence presented by the parties; the Court endeavors to note where a fact is disputed.

### A.  <u>**Life and Death of Bruce Lee**</u>

Bruce Lee was born on November 27, 1940 in San Francisco.  (Woo Decl. Ex. 7, at 58:25-59:1 [Dkt. No. 190] ("Cadwell Dep.")).  He grew up in Hong Kong, and moved to the United States in 1959 to attend college in Seattle.  (*Id.* at 58:6-24).  After college, Lee moved with his wife, Linda Lee (now Linda Cadwell), to California, where Lee earned a reputation as a martial artist and film star.  (Pl.'s 56.1 ¶ 1 [Dkt. No. 176]).  He became one of the most influential martial artists of the 20th century.  (Woo Decl. Ex. 15, at 2 ("Roesler Report")).  Lee starred in several films in the early 1970s, including *Fists of Fury*, *The Big Boss*, *Way of the Dragon*, *Enter the Dragon*, and *Game of Death*.  (Sept. 2012 Minch Decl. Ex. 2, at 37:23-25 [Dkt. No. 224] ("Shannon Lee Dep.")).

In 1971, while shooting *Game of Death*, Lee and his family—wife Linda and children Brandon and Shannon—moved from California to Hong Kong.  (Cadwell Dep. 17:17; 19:9-24).  The Lees purchased two homes in Hong Kong, and lived briefly at Waterloo Hill in Kowloon before moving to 41 Cumberland Road.  (Cadwell Dep. 19:4-24).  After moving abroad, the Lees sold most of their possessions in California, including their house and cars, but left some items— such as furniture, gym equipment, and their dog—to pick up when they ultimately returned to the United States.  (Cadwell Dep. 29:5-12).  Linda claims the Lees were living in Hong Kong only

temporarily and always planned to return to the United States.  (Cadwell Dep. 63:2-22).

However, they had made no affirmative steps to do so.  (*Id.* at 63:16-22).  In 1973, while

wrapping up production of *Game of Death* in Hong Kong, Lee died unexpectedly at the age of

thirty-two.  (*Id.* at 62:16-22).  Lee's influence as a martial artist has endured since his death, both

in the United States and abroad.  Lee developed his own style of martial arts, Jeet Kune Do, and

is one of the most widely-recognized martial artists in history.  (Shannon Lee Dep. 73:18-74:7;

Roesler Report 2).

Lee died intestate, and his assets were probated in California and in Hong Kong.  The

California probate proceedings considered Lee to be a domiciliary of California at the time of his

death.  (*See* Request for Judicial Notice Ex. 2, at 4 ("Petition for Letters of Administration")).[1]

In the California proceeding, Linda claimed that Lee had died with personal property in

California, but the probate documents address only assets located in Hong Kong.  (*Id.*).  Indeed,

it seems that the Estate's only tangible assets were shares in Lee's Hong Kong-based production

company, Concord Productions, which were sold to Lee's business partner, Raymond Chow, in

1976.  (Request for Judicial Notice Ex. 4, at 3, 7 ("Request for Extraordinary Fees")).  In 1976,

the estate paid $27,384 in California inheritance tax, and paid another $28,811 in 1978.  (July 31

Minch Decl. 178 Ex. 8 [Dkt. No. 178]).  The Estate also paid inheritance taxes in Hong Kong.

(Request for Judicial Notice Ex. 7).

## B.  Rights to Bruce Lee's Image and Likeness

During the course of the probate process, the attorneys administrating Lee's Estate spent

time dealing with licensing issues related to Lee's "name, likeness and/or image," including

retaining an agent to negotiate licensing agreements and "thwart unauthorized merchandising

---

[1] As discussed, the Court takes judicial notice of the fact that these filings were made, but the truth of
their contents may be rebutted with other record evidence.

activities" appropriating Lee's likeness.  (Request for Extraordinary Fees 4-6).  The attorneys' efforts resulted in numerous enforcement actions, including litigation, against third parties using Bruce Lee's image without prior authorization.  (*Id.* at 3-5).

The California probate proceeding distributed Bruce Lee's postmortem rights of publicity (the "Lee ROP") to his heirs, with a 50% share passing to Linda and 25% shares passing to Lee's children, Brandon and Shannon.  (Pl.'s 56.1 ¶ 7).  In accord with the requirements of California's post-mortem right of publicity statute, all three heirs registered their rights with the State of California.  (Storti Decl. Ex. 1 [Dkt. No. 171]).  When Brandon died in 1993, his share passed to Linda, giving her a 75% interest.  In 1999, Linda and Shannon organized Concord Moon LLP, a partnership operating in Idaho ("Concord Moon Idaho").  (Aug. 28 Minch Decl. Ex. 4 [Dkt. No. 217]; Pl.'s 56.1 ¶ 9).  The parties dispute what precise rights were conferred to Concord Moon Idaho.  Linda and Shannon both testified that they assigned their interest in the Lee ROP to Concord Moon Idaho, and that the partnership's purpose was to manage the commercial activities and protection of the Lee ROP.  (Cadwell Decl. ¶ 6).  Defendants protest this characterization because Plaintiff has failed to provide documentation showing what assets were transferred to Concord Moon Idaho; specifically, Defendants contend that, without Schedule A to the partnership agreement establishing what rights Concord Moon Idaho assumed, BLE has failed to prove the chain of title to the Lee ROP.  (Defs.' Mem. in Opp. 2-4 [Dkt. No. 213]).

In 2004, Linda and Shannon dissolved Concord Moon LLP and assigned all of its assets and liabilities to a newly formed California corporation, Concord Moon LP ("Concord Moon California").  (Pl.'s 56.1 ¶ 10; Aug. 28 Minch Decl. Ex. 4).  Concord Moon California took possession of Concord Moon Idaho's assets, including the Lee ROP.  (Aug. 28 Minch Decl. Ex. 4).  In 2008, Linda assigned her interest in the Lee ROP to Shannon.  (Pl.'s 56.1 ¶ 11).  Finally,

in June of 2008, Concord Moon California was dissolved and all of its interests and liabilities—including the Lee ROP—were assigned to BLE, which is wholly owned by Shannon.  (*Id.* ¶ 11).  BLE claims to be the current rights-holder in Bruce Lee's postmortem ROP, as well as other various trademarks and copyrights around the world.  (*Id.*; *see also* Shannon Lee Dep. 29:21-22).

The rights to Lee's films, however, are managed separately.  The film rights were originally held by Lee's production company, and upon Lee's death passed to Lee's business partner, Raymond Chow.  (Request for Extraordinary Fees 3, 7).  Fortune Star Entertainment, a Chinese company, holds the rights for most films, including *The Big Boss*, *Fist of Fury*, *Way of the Dragon*, and Warner Brothers Entertainment holds the rights to *Enter the Dragon*.  (Shannon Lee Dep. 37:21-25).  Third parties must obtain licenses before using Bruce Lee's likeness on products.  (Sept. 11 Minch Decl. Ex. 1, at 62:15-62:25 ("Storti Dep.")).  For products featuring movie titles or still images from a film, third parties must obtain a license from both the film rightsholder (Fortune Star or Warner Brothers) and from BLE; to use only the image of Bruce Lee without reference to a particular film, parties need to obtain a license from BLE only.  (*Id.*).  BLE's COO, Kris Storti, describes this as a "dual license" system, and explains that he works closely with agents from Fortune Star and Warner Brothers to implement it.  BLE's standard licensing agreements specifically exclude the rights to any images and other materials from Lee's films.  (Defs.' 56.1 ¶ 84-85; *see also* Sept. 11 Minch Decl. Ex. 5).

In addition to licensing, BLE also protects the Lee ROP by policing the unauthorized use of Bruce Lee's image and likeness.  To that end, BLE responds to allegedly infringing materials discovered by internal investigations or noticed by third parties by issuing cease-and-desist letters.  (Storti Decl. ¶¶ 3-5, 9 [Dkt. No. 171]; *see also* Storti Dep. 24:5-25:9 (explaining BLE procedures for discovering and addressing infringement)).

5

### C. **AVELA and Leo Valencia**

AVELA publishes and licenses artwork related to classic movies, television programs, and music for retail distribution.  (Valencia Decl. ¶ 3 [Dkt. No. 182]).  In 1981, Valencia, AVELA's owner and director, acquired images and photographs related to several of Bruce Lee's films, including *Big Boss*, *Fist of Fury*, *Way of the Dragon*, *Game of Death*, and *Enter the Dragon*.  (*Id.* ¶ 4).  Valencia has been selling movie posters with Bruce Lee's image and has been licensing others to use these images since 1983.  (*Id.* at ¶¶ 5-6).  In 1996, Valencia started X One X productions to license images (including images of Bruce Lee) to third parties.  (*Id.* ¶ 7).  In 1999, Valencia created AVELA to license images to third parties.  (*Id.*).  AVELA has since licensed Lee's image for use on a variety of products, including t-shirts, posters, and bobblehead dolls.  (Pl.'s 56.1 ¶ 12; *see also* Second Am. Compl. Ex. 1).

AVELA does not obtain prior approval from BLE before licensing images of Lee.  (July 31 Minch Decl. ¶ 12).  AVELA's catalog includes numerous images of Bruce Lee, and has licensed several third parties—including Trends International and Jem Sportswear—to produce merchandise with Bruce Lee's image.  (*Id.* Ex. 4, at 52:15-53:12; 59:12-60:6 ("Acuna Dep.")).  Plaintiffs have provided evidence indicating Valencia was aware his conduct may violate BLE's rights.  For example, Liza Acuna, AVELA's licensing agent, testified that she forwarded Valencia a communication from one of AVELA's licensees regarding the need to get BLE's approval before using Bruce Lee's image.  (*Id.* at 67:13-68:23).  Plaintiff also submitted several examples of communications regarding BLE approval directed to Valencia.  (*See* Sept. 11 Minch Decl. Ex. 3).  Defendants claim that AVELA does not permit any of its licensees to use the words "Bruce Lee" on any of the goods they manufacture.  (Valencia Decl. ¶ 9).

AVELA has been sued regarding its use of three other sets of images.  (*See* Sept. 2012

Minch Decl. Ex. 3, at 22:5-23:20 ("Valencia Dep."));[2] *see also Fifty-Six Hope Road Music, Ltd.*

*v. A.V.E.L.A., Inc.*, 688 F. Supp. 2d 1148 (D. Nev. 2010) (finding genuine issue of material fact

as to whether AVELA's use of Bob Dylan's image on t-shirts constituted trademark

infringement); *Fleischer Studios, Inc. v. A.V.E.L.A,. Inc.*, 772 F. Supp. 2d 1155 (C.D. Cal. 2009)

(addressing AVELA's use of Betty Boop's image but finding that plaintiffs had failed to

establish ownership of the images); *Warner Bros. Entm't, Inc. v. X One X Prods.*, 644 F.3d 584

(8th Cir. 2011) (discussing X One X's use of characters from the "Wizard of Oz" and "Gone

With the Wind" and concluding they are in the public domain).

## D.  **The Current Disputes**

This lawsuit arose when one of BLE's employees, Alex Stephens, saw a t-shirt printed

with Bruce Lee's likeness while shopping at a Target store in California.  (Storti Dep. 70:14-

71:14.  After looking online to determine if there were similar, potentially infringing products,

BLE discovered a second t-shirt featuring Bruce Lee being sold by Urban Outfitters.[3]  (*Id.* at

74:8-21; *see also id.* at 73:6-73:24 (describing BLE's use of "online infringing survey")).  Both

shirts display "Bruce Lee" or "B. Lee" on the hang tag and display "AVELA" on the neck tag.[4]

(Defs.' 56.1 ¶ 80).  Target purchased the shirt from AVELA licensee Jem Sportswear, and,

between August and November of 2008, sold 140 Bruce Lee t-shirts in California.  (*Id.* ¶ 78).

Urban Outfitters sold 4,980 Bruce Lee t-shirts between September 2009 and March 2010 in

California and elsewhere in the United States.  (*Id.* ¶ 79).  According to Storti, the image on the

---

[2] Portions of Valencia's deposition are marked "Confidential—Attorney's Eyes Only."  Although some of this testimony is likely subject to the parties' protective order and should not have been made public, Plaintiff has made the entire deposition a part of the record.  The parties should take steps to remedy the inadvertent exposure of confidential information.

[3] BLE also discovered a third t-shirt manufactured by former defendant Mark Ecko Enterprises.

[4] Although the parties seem to agree regarding what the shirts at issue depict, the quality of the images provided to the Court renders it impossible to determine if the parties' positions are correct.

Urban Outfitters t-shirt came from a magazine article relating to the marketing for *Game of Death*. (*Id.* ¶ 55; Storti Dep. 85:3-86:24). Although neither party has produced an original copy of this article, Storti claims the t-shirt images are not stills from the film; but are rather publicity shots taken during production. (Storti Dep. 85:3-86:24). According to employee Kelly Walker, Urban Outfitters realized at least $110,537 in net revenue from these sales. (Pl.'s 56.1 ¶ 14). Plaintiff characterizes this conduct as infringing BLE's rights in the Lee ROP.

AVELA and Valencia have asserted counterclaims arising out of a cease-and-desist letter BLE sent to one of AVELA's licensees, Trends International. In March 2010, AVELA allegedly entered an informal licensing agreement with Trends to print and sell posters with an image of Bruce Lee. Under the agreement, Trends was supposed to print 5,000 posters and pay AVELA a licensing fee for each poster. (Valencia Decl. ¶ 4). On April 13, 2010, BLE sent Trends a cease-and-desist letter charging Trends with infringing BLE's rights; Trends responded on April 26, 2010 and alerted BLE that it had licensed the images from AVELA. (July 31 Minch Decl. Ex. 8). According to Defendants, Trends subsequently cancelled the agreement and never fulfilled its financial obligations to AVELA. (Defs.' Am. Ans. ¶¶ 142-148 [Dkt. No. 121]).

### E.  Procedural History

On April 1, 2009, BLE filed a complaint in the Southern District of Indiana against AVELA, Valencia, and Mark Ecko Enterprises, alleging violations of various state and federal intellectual property laws. [Dkt. No. 1]. BLE amended its complaint to include Target and Urban Outfitters on August 12, 2009. [Dkt. No. 30]. On September 30, 2009, AVELA, Valencia, and Ecko moved to dismiss Plaintiff's First Amended Complaint for lack of personal jurisdiction and improper venue or, in the alternative, to transfer the action. [Dkt. No. 46]. Defendants Target and Urban Outfitters filed a separate motion to dismiss or transfer on

November 18, 2009.  [Dkt. No. 58].  On March 16, 2010, the Honorable William T. Lawrence granted Defendants' motion to transfer the action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).  *Bruce Lee Enters., LLC v. Ecko. Complex, LLC*, No. 09 Civ. 0398, 2010 WL 989909, at *4 (S.D. Ind. Mar. 16, 2010).  In its brief, Defendants argued that the Southern District of New York was a proper venue because several parties with knowledge about the case were present here.  (Defs.' Mem. of Law in Supp. 14-17 [Dkt. No. 47]).

BLE filed its Second Amended Complaint ("SAC") on June 25, 2010.  [Dkt. No. 92]. The SAC asserted claims for violations of California's right of publicity (Count I); the common law right of publicity (Count II); unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count III); common law unfair competition (Count IV); and unjust enrichment (Count V). Defendants filed their Amended Answer on June 10, 2011, and asserted two state law counterclaims alleging interference with contractual relations and intentional interference with economic advantage.  [Dkt. No. 121].  Defendants moved to dismiss the SAC for lack of personal jurisdiction as to Defendants Valencia and AVELA, and for failure to state a claim as to all Defendants.  *Bruce Lee Enters. v. A.V.E.L.A., Inc.*, No. 10 Civ. 2333, 2011 WL 1327137, at *1 (S.D.N.Y. Mar. 31, 2011) (Swain, J.).  Judge Laura Taylor Swain[5] denied the motion to dismiss for lack of personal jurisdiction.  *Id.* at *3.  The Court found that AVELA and Valencia were estopped from arguing that this Court lacked personal jurisdiction because they had taken a contrary position in the Indiana proceedings, and the Indiana court had relied on that position in granting the motion to transfer.  *Id.*  Judge Swain dismissed BLE's claim under the common law of publicity because California does not recognize such a right, and dismissed BLE's claim for

---

[5] The case was originally assigned to Judge Swain, and was then transferred to the Honorable Alison J. Nathan on February 7, 2012.  [Dkt. No. 143].  It was transferred to the undersigned on December 26, 2012.  [Dkt. No. 233].

common law unfair competition against Target and Urban Outfitters because Plaintiff "had made only conclusory allegations of bad faith" as to those parties.  *Id.* at *6-7.

BLE filed its motion for summary judgment on Counts I, III-V, and Defendants' two counterclaims on July 31, 2012.  [Dkt. No. 169].  Defendants filed their cross-motion for summary judgment on Counts I and III-V on August 1, 2012, [Dkt. No. 179], as well as a request to amend their answer to include two additional defenses, [Dkt. No. 193].  On December 26, 2012, the case was transferred to the undersigned.  [Dkt. No. 233].  On January 30, 2013, the Court denied Defendants' motion to amend their Answer because Defendants had not shown good cause for their failure to raise the issue until more than one year after the pleadings were closed.  [*See* Dkt. No. 234].  Consequently, the Court does not address the new defenses raised by Defendants in its resolution of the pending motions.

## II.   DEFENDANTS' EVIDENTIARY OBJECTIONS

Defendants have raised a number of objections to the evidence Plaintiff has submitted in support of its motion.  (*See* Defs.' Objs. To Ev. [Dkt. No. 212]).  A party seeking summary judgment must meet its burden based on the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations,…admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Affidavits submitted in support of a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(d)(4). Although the standard is "not satisfied by assertions made on information and belief," *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004), an affidavit presenting allegations "on the

basis of a party's personal knowledge…may be relied upon," *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 138 (2d Cir. 2009).

In considering a summary judgment motion, "only admissible evidence need be considered by the trial court." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009); *see also LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) ("[O]n summary judgment, a district court has wide discretion in determining which evidence is admissible."  (internal quotation omitted)).  The standard governing admissibility of evidence is the same on a motion for summary judgment as it is at trial. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

A.   **Documents Not Filed Under Seal**

Defendants object to the Court's consideration of the depositions of Mike Tkach and Lee Lurquin, (Minch Decl. Exs. 2, 3 [Dkt. No. 174]), buyers for Urban Outfitters and Target, respectively, because the depositions were not filed under seal as required by the parties' Protective Order.  (*See* Protective Order, dated July 29, 2011 [Dkt. No. 123]).  Assuming that these depositions were subject to the Protective Order, the Court finds that altogether excluding these materials is an inappropriate remedy.  The terms of the Protective Order do not prohibit the use of such confidential information at trial.  (Protective Order ¶ M).  Accordingly, although the Court suggests that the parties work together to redact any confidential information inadvertently exposed to the public, the Court will consider the Tkach and Lurquin depositions in making its decision regarding summary judgment.

B.   **Objections Based on Lack of Foundation for Admitting Documents**

Defendants next challenge as lacking proper foundation a host of BLE's documentary evidence attached as exhibits to the declarations of Plaintiff's attorney, Theodore Minch, [Dkt.

No. 174], and Bruce Lee's wife, Linda Cadwell.[6]  [Dkt. No. 172].  Defendants ground these objections in Federal Rule of Evidence 602, which permits a witness to testify "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  The Court finds that the challenged documents are admissible and thus rejects this objection.

While Minch may not be able to testify regarding some of these exhibits at trial, the documents would be otherwise admissible, either via Cadwell or by cross-examination of Valencia or Urban Outfitters employees, or through other means.  Consequently, the Court overrules Defendants' evidentiary objections to the extent they challenge documentary evidence as lacking foundation.

### C.  <u>Objections to Declaration of Linda Cadwell</u>

Defendants present two further challenges to Cadwell's declaration.  First, Defendants argue that Cadwell's statements that Bruce Lee was an "internationally known and acclaimed movie star and martial artist" and that "Bruce Lee was a domicile of the State of California at the time of his death" are inadmissible opinion testimony under Federal Rule of Evidence 701.[7]  (Cadwell Decl. ¶¶ 2, 4 [Dkt. No. 172]).  Rule 701 limits non-expert witness opinion testimony to that "rationally based on the witness's perception," helpful to determining a fact in issue, and not based on specialized knowledge.  Fed. R. Evid. 701.  Cadwell has personal knowledge of Bruce Lee's domicile based on her role as his spouse and administrator of his estate, and she has

---

[6] With respect to the Minch's declaration, Defendants object to the California probate documents addressing the distribution of Lee's estate, trademark applications submitted by AVELA in the United Kingdom, a Congressional tribute to Bruce Lee, a letter from B&H Company to Urban Outfitters referencing the instant lawsuit, and a federal tax return showing the payment of federal estate taxes by the Bruce Lee estate.  Defendants proffer similar objections to the federal tax documents attached as an exhibits to Linda Cadwell's declaration.

[7] Defendants also challenge Ms. Cadwell's statements as inappropriately stating a legal conclusion.  The Court recognizes that this objection might be helpful to assist a jury in parsing testimony, but finds it inappropriate on a motion for summary judgment.

personal knowledge of Lee's professional reputation based on her intimate involvement in protecting and marketing Lee's likeness. Cadwell's statements in this regard are not inadmissible opinion testimony.

Defendants also challenge Cadwell's testimony regarding transfers of Bruce Lee's publicity rights under the best evidence rule, contending that Plaintiff must produce the original documents evidencing those transfers. Defendants' argument is misplaced. Federal Rule of Evidence 1002 explains that an original writing "is required in order to prove its content," and Rule 1003 sets out when a duplicate copy may be admissible in its place. *See* Fed. R. Evid. 1002-1003. BLE is not attempting to prove the contents of a particular writing, but rather providing testimony regarding Cadwell's recollection of what rights were transferred. Any document recording the transfer of rights "*happen[s]* to record the facts of nonwritten out-of-court transactions," and is not "the essential or primary repository of these events just because they have been recorded in it." *McCormick on Evidence* § 234 (updated 2012) (emphasis added). The best evidence rule does not apply to the transfer records in this case.

### D. Objection to the Declaration of Bob Goetz

Defendants object to Bob Goetz's testimony that the "promotion, sale, and/or distribution of unlicensed Bruce Lee t-shirts…significantly diminishes Trinity products' sales and compromises our ability to ensure compliance with the product quality standards as guaranteed by Bruce Lee Enterprises." (Goetz Decl. ¶ 4 [Dkt. No. 170]). The Court rejects Defendants' allegation that this is inadmissible opinion testimony. This statement is rationally based on Goetz's perceptions as CEO of Trinity Products, is helpful to determine the effect AVELA's actions have had on BLE, and is not based on specialized knowledge. *See* Fed. R. Evid. 701. Consequently, Defendants' objection to Goetz's testimony is overruled.

**E.   Objections to the Affirmation of Chan Mei Yi**

Defendants object to the affirmation of Chan Mei Yi in two respects.[8]  First, Defendants challenge as inadmissible opinion testimony Chan's testimony that "the images on the t-shirts" attached as exhibits to his declaration "are not those of Mr. Yuen Biao."  (Chan Aff. ¶¶ 2-3 [Dkt. No. 169]).  Because Chan testified that he is a "business representative" of Yuen Biao, the Court finds that this statement is rationally based on Chan's perceptions and not on specialized knowledge.  *See* Fed. R. Evid. 701.

Defendants also challenge as inadmissible hearsay Chan's statement that he "discussed" the images with Yuen Biao, who stated that the images were not of himself.  (Chan Aff. ¶ 4).  The Court agrees that this is an out-of-court statement offered to prove the truth of the matter asserted, and is consequently inadmissible hearsay.  Fed. R. Evid. 802.  The Court excludes this portion of Chan's declaration from its consideration of BLE's motion for summary judgment.

**F.   Objections to Declaration of Kristopher Storti**

Defendants also object to portions of the declaration of Kristopher Storti, BLE's COO and general counsel.  First, Defendants claim that Storti's testimony averring that Defendants "harmed BLE by diminishing the licensing revenue attributable to apparel products" and "devalued" BLE's intellectual property rights is expert opinion testimony by a lay witness, and that his testimony lacks a foundation.  (Storti Decl. ¶ 7 [Dkt. No. 171]).  The Court disagrees.  Storti is the COO of BLE and has fulfilled that role or other roles relating to the Bruce Lee publicity rights for years.  The Court finds that Storti's statements are thus rationally based on this experience.  *See* Fed. R. Evid. 702.  Likewise, the Court finds Storti has personal knowledge

---

[8] Defendants had originally argued that the images at issue featured Chinese actor Yuen Biao, and not Bruce Lee.  Defendants appear to have abandoned this argument in their current briefs.

adequate to support his claim of lost revenue and diminished value; he has testified to general harm, not specific numbers, of which his position at BLE would furnish personal knowledge.

Defendants also object to the portion of Storti's declaration discussing conversations Storti had with Alby Amato, the president of one of AVELA's licensees, Mad Engine. (Storti Decl. ¶ 8). This description is inadmissible hearsay, and the Court therefore sustains Defendants' objection. The Court will not consider this testimony in ruling on BLE's summary judgment motion.

### G.  Objections to the Declaration of Alex Stephens

Finally, Defendants object to portions of the declaration of Alex Stephens, BLE's senior vice president of licensing. First, Defendants contend Stephens' discussion of BLE's revenue losses and concomitant negative impact on BLE's licenses is expert opinion testimony by a lay witness. (Stephens Decl. ¶ 4 [Dkt. No. 173]). Stephens based this testimony on his experience working for BLE, and the Court holds that his testimony is rationally based on personal knowledge gained in that experience and not based on specialized knowledge. The Court also overrules Defendants' objection claiming Stephens had no foundation to make claims regarding BLE's knowledge of who manufactured posters featuring the image of Bruce Lee. (*Id.* ¶ 6). Stephens has personal knowledge of this matter through his employment at BLE.

However, the Court agrees with Defendants that Paragraph 5 of Stephens' Declaration, discussing authorized BLE licensees that expressed concern regarding Defendants' unauthorized use of the Bruce Lee likeness, is inadmissible hearsay. The Court therefore excludes Paragraph 5 from its consideration of BLE's motion.

**H. Summary of Evidentiary Rulings**

The Court overrules all but three of Defendant's evidentiary objections.  Consequently, the Court will consider all evidence adduced by BLE in support of its motion except: (1) Paragraph 4 of the Chan declaration, (2) Paragraph 8 of the Storti declaration, and (3) Paragraph 5 of the Stephens declaration.

**III. DEFENDANT'S REQUEST FOR JUDICIAL NOTICE**

Defendants submitted a separate request for the Court to take judicial notice of seven documents, all relating to the probate of Bruce Lee's estate in California and Hong Kong.  [Dkt. No. 196].  District courts may take notice of facts outside the trial record that are "not subject to reasonable dispute," if such facts are "generally known" within the court's jurisdiction or are "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."  Fed. R. Evid. 201(b).  Because judicial notice forecloses the parties' opportunity to use rebuttal evidence, cross-examination, and argument to attack such evidence, "caution must be used in determining that a fact is beyond controversy under Rule 201(b)."  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998).  With respect to documents relating to past litigation, "[a] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"  *Id.* (quoting *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384 (2d Cir. 1992)).  Any facts adjudicated in the prior case "do not meet either test of indisputability contained in Rule 201(b): they are not usually common knowledge, nor are they derived from an unimpeachable source."  *Id.*; *see also Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 498-99 (S.D.N.Y. 2003) (Marrero, J.) (refusing to take notice of public document submitted "in order to demonstrate the truth of the contents therein").

Defendants do not specify for what purpose they request the Court to take judicial notice of the documents at issue.  In light of the principles outlined above, the Court takes judicial notice only of the fact that these probate proceedings existed and that the filings were submitted through the course of such litigation.  The Court does not take judicial notice of any of the contents included in the probate documents; only that such documents were filed.

## IV. LEGAL STANDARD

Summary judgment is appropriate where the materials in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of establishing that a genuine issue of material fact exists.  *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006).  In reviewing the record, the Court must assess the evidence in "the light most favorable to the non-moving party," and resolve all ambiguities and draw all reasonable inferences in its favor.  *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006).  To defeat a finding of summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), but rather must show that there is "significant, probative evidence" on which a reasonable factfinder could decide in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Summary judgment is also appropriate if "the evidence is insufficient to support the non-moving party's case."  *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986) (approving summary judgment if non-moving party provides insufficient evidence as to an essential element of its case on which it bears the burden of proof).

A motion for summary judgment should be denied "if the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party. *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 248); *see also* Fed. R. Civ. P. 56(e). The Court's role is not to weigh evidence and determine its truth, but rather to determine whether there is a genuine issue for trial. *See Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 218 (S.D.N.Y. 2007) (Karas, J.); *see also Celotex*, 477 U.S. at 323-24 (noting that the court should "isolate and dispose of factually insupportable claims"). Accordingly, where adjudication of a claim requires assessing credibility or deciding between conflicting versions of events, summary judgment is not appropriate. *See Jeffreys v. City of New York,* 426 F.3d, 549, 553-54 (2d Cir. 2005); *Hayes v. N.Y.C. Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir. 1996).

## V. MOTIONS FOR SUMMARY JUDGMENT

Four counts remain to be resolved from Plaintiff's SAC: (I) violations of California's post-mortem right of publicity statute, Cal. Civ. Code § 3344.1; (III) false endorsement under § 43(a) of the Lanham Act; (IV) common law unfair competition; and (V) unjust enrichment under New York state law. Both Plaintiff and Defendants have moved for summary judgment on each count. Defendants also assert two counterclaims which seek damages for (I) alleged interference with contractual relations and (II) interference with economic advantage. Plaintiff has moved for summary judgment on both counterclaims. Viewing the evidence in the light most favorable to each moving party, the Court grants in part and denies in part Plaintiff's motion for summary judgment and denies Defendants' motion for summary judgment.

### A.  Count I: California's Post-Mortem Right of Publicity Statute

Both Defendants and BLE have moved for summary judgment on BLE's claim that Defendants violated the California statutory right of publicity. Cal. Civ. Code § 3344.1. The

Court partially grants BLE's summary judgment motion and denies Defendants' motion in its entirety.

Section 3344.1 of the California Civil Code holds "any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent" liable for the greater of $750 or the actual damages suffered as a result of the unauthorized use. Cal. Civ. Code § 3344.1(a). In 2007, the California legislature expressly made Section 3344.1 retroactive to "includ[e] those deceased personalities who died before January 1, 1985." Cal. Civ. Code § 3344.1(f)(4)(p); *see also Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 991-92 (9th Cir. 2012) (explaining rationale for amendments making posthumous right of publicity retroactive).

For the following reasons, the Court rejects Defendants' affirmative defenses, then addresses whether summary judgment is appropriate for either party on each element of Plaintiff's right of publicity claim.

       1. <u>Defendants' Affirmative Defenses</u>

At the outset, Defendants offer three arguments to avoid the applicability of Section 3344.1. Namely, Defendants argue that (1) this Court should decline to exercise supplemental jurisdiction over this claim; (2) Section 3344.1 is unconstitutional as applied; and (3) Plaintiff's right of publicity claim is preempted by the federal Copyright Act.[9]

*a. Whether the Court's Jurisdiction is Appropriate*

Defendants argue that the Court should refuse to exercise supplemental jurisdiction over BLE's state law claim pursuant to 28 U.S.C. § 1367(c) because Plaintiff's state law claim

---

[9] Defendants also presented arguments under the First Amendment and administrative preemption. However, because Defendants failed to raise these affirmative defenses in its Answer, the Court deemed these arguments waived. (*See* Opinion & Order dated Jan. 30, 2013 [Dkt. No. 234]).

predominates over the other claims in the action.[10]  District courts "shall have supplemental jurisdiction" over state law claims that "form part of the same case or controversy" as the claim justifying original jurisdiction.  28 U.S.C. § 1367(a).  A claim forms part of the same case or controversy if it "derive[s] from a common nucleus of operative fact."  *Shahriar v. Smith & Wollensky Rest. Group, Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (internal citation omitted).

Because the Lanham Act claim and BLE's arise out of the same nucleus of operative fact—namely, whether Defendants violated BLE's intellectual property rights by producing and selling t-shirts with Bruce Lee's likeness—the Court may exercise its "discretion to decline supplemental jurisdiction…*only if* founded upon an enumerated category of subsection 1367(c)." *Id.* (citing *Itar-Tass New Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 448 (2d Cir. 1998)). Thus, the Court may decline jurisdiction only if Plaintiff's state law claim "substantially predominates" over Plaintiff's federal claim.  28 U.S.C. § 1367(c).

The Court denies Defendants' invitation to decline jurisdiction.  Plaintiff's state law claims arise from the same nucleus of operative fact as its Lanham Act claim; namely, that Defendants' use of Bruce Lee's likeness violated BLE's rights.  The claims require similar proof, raise similar issues and defenses, and will not require significant judicial resources to adjudicate. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966) (laying out factors to consider in asserting supplemental jurisdiction); *see also BriarPatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (approving district court's supplemental jurisdiction over non-copyright claims with same nucleus of operative fact).  Further, Defendants already moved to dismiss based on lack of supplemental jurisdiction while this case was pending in Indiana.  (*See*

---

[10] Defendants have presented no binding authority to support its proposition that the Court can deny supplemental jurisdiction at this stage in the proceedings.  *See Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1287-88 (8th Cir. 1998) (holding that the district court could decline to exercise supplemental jurisdiction pursuant to § 1367(c) "at any time in the litigation").  Because the Court retains supplemental jurisdiction, it need not resolve this issue.

Defs.' Br. in Supp. 8 [Dkt. No. 59]).  Although Defendants' motion addressed Indiana's right of publicity statute and argued that provision raised novel questions justifying declining jurisdiction under § 1367(c)(1), Plaintiff's claim under Indiana law was identical to their claim under California law.  If Defendants believed this claim predominated over the federal claims, they could—and should—have raised it earlier in the litigation.

The Court finds that Plaintiff's state law claims arise from the same nucleus of operative fact as its state law claims, and do not predominate over the federal claims.  The Court's exercise of supplemental jurisdiction is thus appropriate, particularly given the significant time and resources the parties have already expended in litigating this claim.

### b. Whether Section 3344.1 is Unconstitutional as Applied

Defendants' next challenge to Plaintiff's state law claim is an argument that the California right of publicity statute, as applied, violates the due process clause of the California state constitution.  According to Defendants, Valencia has been selling merchandise bearing images of Bruce Lee since 1983, and has been licensing images of Lee to third parties through AVELA and his former company, X One X, since 1996.  (Defs.' Mem. in Supp. 15 [Dkt. No. 192]).  Defendants contend that Section 3344.1 deprives Valencia and AVELA of vested property rights without due process of law.

The California legislature expressly made Section 3344.1 retroactive and extended its coverage to personalities who died before 1985, including Bruce Lee.  *See* Cal. Civ. Code § 3344.1(f)(4)(p).  Laws intended to be applied retroactively must be enforced unless due process considerations mandate a different result.  *See W. Sec. Bank v. Superior Court*, 933 P.2d 507, 514 (Cal. 1997).  In some circumstances, a retroactive law which deprives individuals of a vested property right without due process may violate the California constitution.  *See, e.g.*, *In re*

*Marriage of Buol*, 218 P.2d 356, 357 (Cal. 1985) (finding retroactive law requiring written agreement to enforce property transfer unconstitutionally deprived spouse of vested right in marital property transferred by oral agreement).  To assess whether a law violates due process, courts should consider the significance of the state interest served by the law, how important retroactive application is to accomplishing that interest, the extent and legitimacy of reliance upon the former law, and the extent to which retroactive application would disrupt actions taken based on such reliance.  *See In re Marriage of Bouquet*, 546 P.2d 1371, 1376 (Cal. 1976).

None of these factors favors Defendants' claim, and the Court finds that the retroactive application of California's right of publicity statute does not violate due process.  Defendants' right to use images of Bruce Lee is not vested: unlike cases in which courts have found that a statute implicates due process concerns, Valencia never believed he *owned* the images.  At best Valencia can claim he believed he had a right to *use* the images without paying a licensing fee. This does not rise to the level of a vested interest, nor does it constitute sufficient reliance to trigger due process.  Moreover, the state interest served by the right of publicity statute is significant as it protects celebrities' personas from unauthorized exploitation, a concern of particular importance in California given the number of entertainers living in that state.  The California legislature thought this protection was important enough to specifically render Section 3344.1 retroactive.  Indeed, the California legislature voted on the retroactivity after a California district court held it did not apply to Marilyn Monroe.  *See Milton H. Greene Archive*, 692 F.3d at 991-92; *see also see also Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, No. CV 05-02200, 2008 WL 655604, at *12 (C.D. Cal. Jan. 7, 2008) (examining history of retroactivity amendment in detail and discussing legislature's interest in preventing the exploitation of

deceased personality's publicity rights).  Valencia has offered no reason to conclude this

extension implicated—much less violated—his due process rights.

### c. Whether Count II is Preempted By the Copyright Act

Defendants argue that Plaintiff's Section 3344.1 claim is preempted by the federal

Copyright Act, 17 U.S.C. § 301 *et seq.*  In Defendants' view, the allegedly infringing t-shirts

feature images from publicity materials, such as movie posters, related to Bruce Lee's films.

Because these materials are in the public domain,[11] Defendants argue, BLE is using Section

3344.1 "to circumvent its lack of copyright ownership in the characters portrayed by Lee."

(Defs.' Mem. in Supp. 15).  Plaintiff counters that it is not seeking to protect movie posters or

other images associated with Lee's films, but rather seeking "only to control the image of Lee

himself."  (Pl.'s Mem. in Opp. 15 [Dkt. No. 216]).  Defendants are free to use publicity

photographs or other materials associated with Lee's films; Plaintiff's complaint under Section

3344.1 concerns only Defendant's commercial exploitation of "Lee's name, image and likeness"

without prior approval from BLE.  (*Id.* at 17).

A state law claim is preempted under 17 U.S.C. § 106 when (1) the claim "seeks to

vindicate legal or equitable rights that are equivalent to" the rights protected by 17 U.S.C. § 106

(the "general scope requirement"); and (2) "the particular work to which the state law claim is

being applied falls within the type of works protected by the Copyright Act under Sections 102

and 103" (the "subject matter requirement").  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d

---

[11] Whether a work entered the public domain must be determined based on the copyright law in force at
the time the work was published; in this case, the 1909 Copyright Act.  *See Warner Bros. Entm't*, 644
F.3d at 592.  Under the 1909 Act, materials published without adequate "copyright notice fell into the
public domain, precluding forever any subsequent copyright protection of the published work."  *Id.*
(holding movie posters and other publicity materials from *The Wizard of Oz* and *Gone With the Wind* had
fallen into the public domain); *see also Sanga Music, Inc. v. EMI Blackwood Music, Inc.*, 55 F.3d 756,
759 (2d Cir. 1995) (noting that it was "blackletter" that copyright was achieved under the 1909 Act by
publication with notice).

841, 848 (2d Cir. 1997) (internal quotation omitted).  The subject matter protected by the Copyright Act encompasses only "original works of authorship fixed in any tangible medium of expression," 17 U.S.C. § 102, and compilations and derivative works only to the extent the author's contributions are "distinguished from the preexisting material employed in the work," 17 U.S.C. § 103.

Defendants have failed to show that Plaintiff's claim is preempted by the Copyright Act because Bruce Lee's persona and likeness do not fall within the subject matter of copyright.[12]  In general, an individual's name, likeness, and persona are not copyrightable.  *See, e.g.*, *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005) (noting that "[a] person's likeness—her persona—is not fixed"); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003-04 (9th Cir. 2001) (finding no preemption of statutory right of publicity claim for surfers bringing challenge to unauthorized use of their image in a calendar); *Brown v. Ames*, 201 F.3d 654, 661 (5th Cir. 2000) ("[T]he tort of misappropriation of a name or likeness protects a person's *persona*.  A *persona* does not fall within the subject matter of copyright."); *Factors, Etc., Inc. v. Pro Arts, Inc.*, 496 F. Supp. 1090, 1097 (S.D.N.Y. 1980) (Tenney, J.) (finding the Copyright Act did not preempt Elvis Presley's heirs' claim for right of publicity), *rev'd on other grounds*, 652 F.2d 278 (2d Cir. 1981); *see also* J. Thomas McCarthy, 2 *Rts. of Publicity & Privacy* § 11:52 (2d ed. 2004) (explaining that the subject matter of a right of publicity claim is "*not* a particular picture or photograph of plaintiff" but rather "the very identity or persona of the plaintiff as a human being").

In instances where courts have found right of publicity claims to be preempted, the plaintiff's likeness was also "fixed in a tangible medium" within the meaning of the Copyright

---

[12] Although not explicit in its briefing, the Court assumes that Defendants argue Plaintiff's claim is preempted as applied.

Act, and thus subject to copyright protection.  *See, e.g.*, *Jules Jordan Video, Inc. v. 144942 Can. Inc.*, 617 F.3d 1146, 1153-54 (9th Cir. 2010) (finding right of publicity claim preempted when claim was based entirely on misappropriation of various DVDs and plaintiff's performance therein, not his persona); *Laws v. Sony Music Entm't*, 448 F.3d 1134, 1142-43 (9th Cir. 2006) (finding right of publicity claim preempted when allegations focused on voice recording, not persona).  BLE's right of publicity claim is wholly based on Defendants' alleged unlicensed use of Bruce Lee's name, likeness and persona rights, which are not included in the subject matter of copyright.  Indeed, even if Defendants correctly assert that the t-shirt images are drawn from Bruce Lee's films, BLE's claim is not preempted: while use of the photographs themselves may be permitted under the Copyright Act, use of Bruce Lee's image, likeness, and persona subject Defendants to liability for violating Lee's right of publicity.

Defendants further contend that Plaintiff is trying to circumvent copyright protections by using a right of publicity claim to hold them liable for using works in the public domain.  The Court disagrees.  First, the record does not support Defendants' claim that the images licensed by AVELA are drawn from movie materials in the public domain; having reviewed all of the evidence presented, the Court is unable to conclude who or what is depicted in the t-shirts at issue.  Moreover, even if Defendants are correct that the t-shirts display public domain materials, Plaintiff's complaint is that the t-shirts use Bruce Lee's *persona*—his likeness and presence as a martial artist, not his films or the characters he portrayed therein—without authorization from BLE.  *See, e.g.*, *Downing* (addressing right of publicity claim for use of photograph); *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990) (considering right of publicity claim based on photograph brought by Babe Ruth's heirs).  The rights in Lee's persona and likeness are not fixed in a tangible medium, and do not fall within the subject matter of copyright.

2.  <u>Whether Summary Judgment is Appropriate on the Elements of a Section 3344.1 Claim</u>

BLE claims that Bruce Lee was a "personality" within the meaning of Section 3344.1, and that the Lee ROP had value at the time of Lee's death; Defendants do not challenge these contentions.  However, the parties disagree regarding (1) Lee's domicile at the time of his death; (2) whether BLE actually owns the Lee ROP, and consequently whether BLE has standing to bring this claim; (3) whether Defendants violated BLE's rights; and (4) whether an injunction is warranted because BLE suffered harm as a result of the alleged violations.

*a.  Bruce Lee's Domicile at the Time of His Death*

The postmortem right of publicity under Section 3344.1 is limited to individuals who were California domiciliaries at the time of their death.  *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1147-49 (9th Cir. 2002).  The parties dispute Bruce Lee's domicile at the time of his death: BLE claims Lee died a domiciliary of California, while Defendants argue that he died a domiciliary of Hong Kong.

In California, "[d]omicile…includes both the *act* of residence and an *intention* to remain; a person may only have one domicile at a given time, but he may have more than one physical residence separate from his domicile, and at the same time."  *Smith v. Smith*, 288 P.2d 497, 499 (Cal. 1955) (internal citations omitted); *see also Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) ("A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return.").  Moreover, "a person's old domicile is not lost until a new one is acquired."  *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir. 1986) (internal citation omitted).  A change in domicile thus "requires the confluence of (a) physical presence at the new location with (b) an intention to remain there indefinitely.  *Id.*; *see also Gaudin v. Remis*,

379 F.3d 631, 636-7 (9th Cir. 2004) (noting that an individual can change domicile by "being physically present in the new jurisdiction with the intent to remain there").

The Court finds that neither party has carried its burden regarding Lee's domicile at the time of his death and finds this to be a genuine issue of material fact.  Although the Lee family did leave some possessions in California, they sold their house and cars and relocated with their children to Hong Kong.  The Lees purchased property in Hong Kong, their children attended school in Hong Kong, and Lee's production company was located in Hong Kong.  Based on these facts, a reasonable juror could conclude that Lee had relocated to Hong Kong with "an intention to remain their indefinitely."  *Lew*, 797 F.2d at 750.  Conversely, Cadwell testified that the Lees were living in Hong Kong temporarily, and never intended for their stay to be indefinite.[13]  Indeed, the Lees left some personal property—including a family dog—in California; moved back to California immediately following Lee's death; probated Lee's estate in California,[14] and paid California and federal inheritance taxes.  From these facts, a reasonable juror could also conclude that Lee's domicile remained in California and he had not formed the intent required to establish a domicile in Hong Kong.

Plaintiff's argument that judicial estoppel prevents Defendants from challenging Lee's domicile is misplaced.  Judicial estoppel precludes a party "from taking a position contrary to a position the party has taken in an earlier proceeding."  *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71 (2d Cir. 1997).  Defendants correctly point out that estoppel is inapplicable in this case

---

[13] Cadwell's testimony could support either party's position.  Specifically, she testified that "[w]e wanted to live in some area, first, in Southern California to be available to the film industry.  But we also talked about going back to live in Seattle.  So we had a lot of dreams."  (Cadwell Dep. at 63).

[14] BLE appears to argue that the probate proceedings in California are dispositive as to Lee's domicile because they list Lee as a "resident" of California at the time of his death.  *See* Cal. Code Regs. Tit. 18, § 13303.4 ("For the purpose of the Inheritance Tax Law the term 'residence' is synonymous with legal residence or domicile.").  However, while the Court takes notice that the Lees filed probate proceedings in California, the Court cannot accept that the documents prove anything more than the existence of estate property in California.  *See Int'l Star Class Yacht Racing Ass'n*, 146 F.3d at 70.

because Defendants—the party against whom estoppel would apply—have never asserted a contrary factual position.  *See AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Inds. Inc.*, 84 F.3d 622, 628 (2d Cir. 1996).  Estoppel principles simply do not apply against Defendants in this case.

Because a genuine issue of material fact remains as to Bruce Lee's domicile at the time of his death, summary judgment on this issue is inappropriate.

### b.  *BLE's Ownership of the Rights to Lee's Image and Likeness*

The parties also assert opposite positions regarding ownership of the rights to Bruce Lee's image and likeness (the "Lee ROP").  Plaintiff argues that BLE owns the rights to the Lee ROP, but Defendants challenge this on two grounds.  First, Defendants argue that BLE cannot establish that they own the Lee ROP because BLE has failed to produce any documentation regarding what assets were transferred to Concord Moon Idaho in 1999.  Second, assuming BLE can establish chain of title for the Lee ROP, Defendants contend that Linda and Shannon relinquished their rights in the Lee ROP when they sold the rights to Lee's films to Lee's business partner, Raymond Chow.

### i.   Rights to the Lee ROP

As discussed above, Plaintiff claims that the Lee ROP passed to Lee's wife and children upon Lee's death.  According to Plaintiff, Shannon and Linda then formed Concord Moon Idaho to manage the Lee ROP.  Concord Moon Idaho transferred this interest to Concord Moon California, which ultimately transferred the rights to BLE.  Defendants, however, argue that BLE cannot establish it is the rightful owner of the Lee ROP because there is no evidence about what rights—if any—Concord Moon Idaho was granted because Plaintiff has failed to produce Schedule A to the partnership agreement setting out Concord Moon Idaho's assets.  (Defs. Mem. in Opp. 3).  Plaintiff's only evidence to support its version of the transfer of title consists of

declarations from Linda Cadwell, Shannon Lee, and BLE COO Kris Storti; there is no documentary evidence in the record indicating Concord Moon Idaho assumed the Lee ROP.[15]

Given this record, the Court finds that summary judgment is inappropriate as to this element: there is a genuine issue of material fact as to whether Concord Moon Idaho ever took possession of the Lee ROP.  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Jeffreys*, 426 F.3d at 553-54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).  Because a reasonable juror could find that the Lee family and BLE employees lack credibility given their personal interest in the case, the Court cannot award summary judgment to BLE on this point.  Conversely, awarding summary judgment in favor of Defendants is also inappropriate because a reasonable juror could find that BLE does own the rights to the Lee ROP.

### ii.    Rights to Lee's Films

Even assuming BLE can establish a valid chain of title, Defendants argue that BLE does not have standing to bring this claim because the Lee family relinquished its rights to Bruce Lee's films when it sold its share in Lee's film production company, Concord Productions, to Raymond Chow, Bruce Lee's business partner.  (Request for Extraordinary Fees 3, 7).  According to Defendants, because the t-shirts at issue feature characters from films to which the Lee family sold its rights, BLE cannot challenge Defendants' conduct under Section 3344.1.  As evidence, Defendants offer examples of BLE's standard licensing agreements, which specifically exclude the rights to Bruce Lee's films.  (See Defs.' Mem. in Supp. 11).

---

[15] Plaintiffs also argue that, even if the chain of title passing the rights to Concord Moon Idaho is not clear, Shannon and Linda surely passed the rights to Concord Moon California (for which records regarding the partnership assets are available).  However, Concord Moon California simply assumed whatever rights were held by Concord Moon Idaho; to establish a valid chain of title under that theory, Linda and Shannon would have to assign title directly.

Defendants' argument is misplaced.  The rights to Bruce Lee's image and likeness are wholly separate from the rights to Lee's films.  As Kris Storti, BLE's COO, explained in his deposition, parties who seek to license materials from Bruce Lee's films must obtain a "dual license": they must obtain a license from BLE to use Bruce Lee's likeness *and* a license from Fortune Star or Warner Brothers, the companies who holds the rights to Bruce Lee's films. (Storti Dep. at 62:15-25).  The right of publicity protects more than just film rights; it protects a celebrity's *persona* from unauthorized exploitation.  *See, e.g.*, *Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*, 486 F. supp. 2d 309 (S.D.N.Y. 2007) (Byrne, J.) (analyzing descendibility of Marilyn Monroe's right to publicity separately from the rights to her films); *Warner Bros., Inc. v. Curtis Mgmt. Group, Inc.*, No. 91 Civ. 4016, 1995 WL 420043 (C.D. Cal. Mar. 31, 1993) (analyzing movie/character rights and right of publicity separately for James Dean).  If Defendants' version of the law were correct, there would be no need for the California legislature to enact Section 3344.1, as the rights it protects would already by encompassed in the existing intellectual property regime.

> c. *Whether Defendants Violated Lee's Right of Publicity Under Section 3344.1*

In order to prevail on its motion for summary judgment, BLE must show that Defendants violated Section 3344.1 by selling products with Bruce Lee's image without prior consent from BLE.[16]  Cal. Civ. Code § 3344.1 (a)(1).  In its motion for summary judgment, BLE presents sufficient evidence for the Court to conclude that Defendants have violated Section 3344.1 by manufacturing, advertising, and selling products bearing Bruce Lee's likeness without BLE's consent.  Deposition testimony from AVELA's licensing agent, Liza Acuna, confirms Valencia's and AVELA's longtime licensing and sale of Bruce Lee's likeness to third parties.  (*See* Aug. 26

---

[16] This element is, of course, contingent on BLE holding the rights to Bruce Lee's ROP.

Minch Decl. Ex. 6 [Dkt. No. 197] ("Acuna Dep.")).  AVELA's revenue spreadsheets also reflect profits AVELA derived from licensing Bruce Lee's likeness.  (*See* July 31 Minch Decl. ¶ 4).  Deposition testimony from Target's senior buyer, Lee Lurquin, establishes that Target sold AVELA's Bruce Lee t-shirts in 2008 in California.  (*See id.* Ex. 3).  Deposition testimony from a buyer for Urban Outfitters demonstrates that they also purchased and sold Bruce Lee t-shirts from AVELA.  (*See id.* Ex. 2).  Both Target and Urban Outfitters purchased the t-shirts through Jem Sportswear, a licensee of AVELA.  (*See* Acuna Dep. 59:12-60:6 (confirming that Jem was a licensee of AVELA)).  AVELA has never received authorization from BLE to use Bruce Lee's image.  (July 31 Minch Decl. ¶ 12).

After examining the record, the Court finds that there is no genuine issue of material fact as to whether or not Defendants violated Section 3344.1 by manufacturing, soliciting, and selling merchandise featuring the likeness of Bruce Lee without prior consent from BLE.  Even if the Court were to agree with Defendants' argument that the images on the t-shirts are movie stills, Defendants would still be liable under Section 3344.1 because the right of publicity addresses BLE's "persona," and "not a particular picture or photograph."  Downing, 265 F.3d at 1003-04 (internal quotations omitted).  Section 3344.1 protects the "very identify or persona of the plaintiff as a human being."  *Id.* at 1004.  Even if Defendants are correct that the images used are otherwise subject to copyright protections, BLE has an independent cause of action arising from Defendants' use of Lee's image and likeness.  The Court accordingly awards summary judgment in favor of BLE as to this element.

> d. *Whether BLE Suffered Harm as a Result of Defendants' Conduct and is Entitled to Injunctive Relief*

In the SAC, BLE requested an injunction directing Defendants to "destroy or surrender to BLE any and all products" bearing Lee's persona or likeness, including those in the possession

of "Defendants' franchisees, retailers and/or distributors."  (SAC 19 ¶¶ F, G).  To obtain

injunctive relief, a party must demonstrate that (1) it has suffered an irreparable injury; (2)

remedies available at law are inadequate compensation for that injury; (3) considering the

balance of hardships, a remedy in equity is warranted; and (4) the public interest would not be

disserved by a permanent injunction.  *See eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

(2006).  Plaintiff's brief addresses only the first factor, and argues that Defendants' conduct has

caused BLE to suffer irreparable harm by diluting the value of Bruce Lee's persona, making it

more difficult for BLE's valid licensees to break into various stores, and diminishing the revenue

available to legitimate users of the Lee ROP.  (Pl.'s Mem. in Supp. 18-19 [Dkt. No. 175]).

Although the Court agrees with Plaintiff that "a celebrity's interest in his name and

likeness is unique" and that injunctive relief is often warranted to prevent harm to a celebrity's

persona on a misappropriation claim, the Court finds that BLE has not established that it was

*irreparably* harmed by Defendants' conduct.  Injunctive relief may well be warranted when the

unauthorized use of a celebrity's likeness damages his marketable reputation.  *See, e.g.*, *Church

of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 41 (2d Cir.

1986) (noting that likelihood of confusion over endorsement of a product can constitute

irreparable harm); *Ali v. Playgirl, Inc.*, 447 F. Supp. 723, 729 (S.D.N.Y. 1978) (Gagliardi, J.)

(awarding injunction for unauthorized full frontal nude drawing of Mohammed Ali and finding it

would damage his reputation).  BLE has not shown, however, that the allegedly infringing

merchandise had any negative effect on its business apart from reducing its revenue, nor has

BLE produced any evidence showing how the infringing items have reduced the value of Bruce

Lee's likeness.  Absent more evidence, the Court cannot ascertain whether or not Defendants'

conduct—if in violation of any law—irreparably harmed BLE.

### B.  Count III: Unfair Competition under the Lanham Act

Section 43(a) of the Lanham Act creates liability for anyone who uses a "symbol" in connection with goods or services as a "false designation of origin" or "false or misleading representation of fact" if such use "is likely to cause confusion…as to the origin, sponsorship, or approval" of the goods.  15 U.S.C. § 1125(a)(1).  False endorsement claims under the Lanham Act are an "appropriate vehicle" to assert claims "falsely implying the endorsement of a product or service by a real person."  *Albert v. Apex Fitness, Inc.*, No. 97 Civ. 1151, 1997 WL 323899, at *1 (S.D.N.Y. Jun. 13, 1997) (Kaplan, J.) (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 28:15 (4th ed. 1996)).  To establish a false endorsement claim, Plaintiff must establish that Defendants "(1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services."  *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (Chin, J.) (internal citations omitted).  In the Second Circuit, a celebrity may assert a false endorsement claim where the defendant uses the celebrity's persona without permission to suggest false endorsement or association.  *See, e.g.*, *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 629-30 (S.D.N.Y. 1985) (Motley, J) (finding false endorsement where Woody Allen challenged use of lookalike in print ad for video store chain); *Pelton v. Rexall Sundown, Inc.*, 99 Civ. 4342, 2001 WL 327164, at *3 (S.D.N.Y. Apr. 4, 2001) (Martin, J.) (considering but rejecting model's false endorsement claim over her image used on packaging for weight loss supplement).

Both Plaintiff and Defendants have moved for summary judgment on this count.

## 1.   Ownership of the Mark

Defendants renew their argument that they are entitled to summary judgment on this claim because BLE does not own the rights to the Lee ROP.  For the same reasons discussed above, the Court finds that summary judgment is inappropriate because a genuine issue of material fact exists as to whether or not the rights to the Lee ROP were transferred to Concord Moon Idaho, and consequently whether BLE is the current rights-holder.

## 2.   Likelihood of Confusion

The "crucial determinant" in a false endorsement action is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark." *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 516 (S.D.N.Y. 2012) (Jones, J.) (internal quotation omitted); *see also Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990).  This is normally a factual question for the jury, but courts may dismiss claims "as a matter of law where 'the court is satisfied that the products or marks are so dissimilar that no question of fact is presented.'" *Pirone*, 894 F.2d at 584; (quoting *Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 746 F.2d 112, 116 (2d Cir. 1984)).  Thus, to prevail on its motion for summary judgment, BLE must show that the photographs on AVELA's t-shirts "mislead[] consumers into believing that [he] endorsed or produced the products."  *Pelton*, 2001 WL 327164, at *3.

In *Pirone*, the Second Circuit considered the likelihood of consumer confusion as to a calendar featuring numerous photographs of baseball players, including three of Babe Ruth, one of which appeared on the calendar's cover.  *Pirone*, 894 F.2d at 581.  Although plaintiffs, Babe Ruth's heirs, claimed the images falsely implied that Babe Ruth endorsed the calendar, the

Second Circuit disagreed and found that "an ordinarily prudent purchaser would have no difficulty discerning that these photos are merely the subject matter of the calendar and do not in any way indicate sponsorship." [17]  *Id.* at 585.  However, *Pirone* is distinguishable from this case: while Babe Ruth's likeness appeared as one of many photographs of baseball players, AVELA's t-shirts feature *only* an image of Bruce Lee; indeed, this image is the primary reason a consumer would decide to purchase the t-shirt.  The calendar also prominently featured the name of its publisher in several locations, while "AVELA" only appears on the shirt's neck tag, where it is not as immediately apparent.

In the context of trademark, courts in the Second Circuit weigh eight factors in determining whether there is a likelihood of consumer confusion (the *Polaroid* factors):

> (1) the strength of plaintiff's mark;
> (2) the similarity of the parties' marks;
> (3) the proximity of the parties' products in the marketplace;
> (4) the likelihood that the plaintiff will "bridge the gap" between
> the products;
> (5) actual consumer confusion between the two marks;
> (6) the defendant's intent in adopting its mark;
> (7) the quality of the defendant's product; and
> (8) the sophistication of the relevant consumer group.

*Playtex Prods., Inc. v. Georgia-Pac. Corp.*, 390 F.3d 158, 162 (2d Cir. 2004) (citing *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)).  In balancing these factors, "district courts should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins."

---

[17] Defendants claim that *Pirone* also stands for the proposition that the Second Circuit does not recognize false endorsement claims brought by deceased celebrities.  (*See* Defs.' Mem. in Opp.16 [Dkt. No. 213]). This is a misreading of *Pirone*.  Although the court found that the daughters' claim was not cognizable, the decision was based on the fact that there was no likelihood of confusion from the calendar—not, as Defendants contend, based on a blanket bar against false endorsement claims from deceased celebrities. *See Pirone*, 894 F.2d at 584-85.  Here, too, Bruce Lee's death will affect the likelihood that the shirts would create consumer confusion; but does not totally bar BLE's Lanham Act claim.

*Playtex Prods.*, 390 F.3d at 162.  Although the Second Circuit has not specifically extended these factors into the false endorsement context, the Court agrees with the Ninth Circuit's approach, which equates the term "mark" with the celebrity's persona.  *See Downing*, 265 F.3d at 1007.  Under this approach, "the term 'mark' applies to the celebrity's persona" and "the 'strength' of the mark is the level of recognition the celebrity has among the segment of the public to whom the goods are advertised is directed."  *Id.*  Thus, although many of the *Polaroid* factors are inapplicable in a celebrity endorsement case, the Court finds relevant factors to include: the level of recognition Bruce Lee has among purchasers of AVELA's t-shirts, the similarity between Bruce Lee's likeness and the likeness used by AVELA, the level of actual consumer confusion regarding who endorsed the t-shirts, AVELA's intention in selecting Bruce Lee's image, the quality of AVELA's products, and the sophistication of t-shirt purchasers.

Both Plaintiff and Defendants argue that they have provided enough evidence to be awarded summary judgment as to likelihood of consumer confusion.  The Court finds that a genuine issue of material facts exists as to whether there is a likelihood of confusion in this case, and consequently denies both parties' motions for summary judgment as to this element.

### a.  Plaintiff's Motion

Plaintiff presents no evidence to support a finding of consumer confusion aside from conclusory statements that the t-shirts at issue feature an image resembling Bruce Lee and have hang tags labeled "Bruce Lee" or "B. Lee."  While the Court agrees that consumers may believe these images to be of Bruce Lee, Plaintiffs have not established that consumers would believe Bruce Lee or his estate *endorsed* AVELA's products.  Consequently, summary judgment in favor of Plaintiff is inappropriate.

36

b.  *Defendants' Motion*

Defendants argue that summary judgment in their favor is appropriate because there is no likelihood of consumer confusion.  In support of this contention, Defendants have provided a survey conducted by Bruce Isaacson, a marketing research expert.  (Isaacson Decl. [Dkt. No. 185]).  A survey "may indicate the existence of a question of fact on the likelihood of confusion" so long as it has been "fairly prepared" and "its results are directed to the relevant issues." *Universal City Studios*, 746 F.2d at 118.  "The evidentiary value of a survey's results rests upon the underlying objectivity of the survey itself."  *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 300 (2d Cir. 1992).  This objectivity depends on many factors, including whether the survey population was properly defined, whether the questions were clearly framed and directed at the real issues, and whether the questions were leading or suggestive.  *See id.*; *see also Universal City Studios*, 746 F.2d at 118 (rejecting plaintiff's survey evidence because it questioned past consumers of defendant's products rather than potential consumers); *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1272 (S.D.N.Y. 1990) (Mukasey, J.) (listing seven criteria for judging the trustworthiness of a survey).

Dr. Isaacson modeled his survey after one used in a similar case filed against AVELA involving t-shirts featuring images of Bob Marley.  *See Fifty-Six Hope Road Music.*, 688 F. Supp. 2d at 1167-1168.  In Dr. Isaacson's survey, 564 participants, all individuals planning to purchase graphic tees at Target or Urban Outfitters, were shown either the filmstrip shirt sold by Urban Outfitters or a control shirt, which was identical except the filmstrip images were of an Asian male (not Bruce Lee) in a martial arts costume; the hang tag was edited to remove the words "Bruce L.", and the Chinese writing on the front of the test t-shirt was removed.  (Isaacson Decl. Ex. 1, at 10-12).  Participants were asked various questions, including who they believed

37

made, endorsed, and approved the t-shirt.  (*Id.* at 13-15).  Dr. Isaacson compiled these responses

to reflect what he deemed "net confusion," meaning the difference between responses in the test

and the control group.  Overall, net confusion ranged from 11.6% to 12%, confusion regarding

permission or approval ranged from 8.9% to 10.1%, and confusion regarding endorsement

ranged from 7.5% to 7.9%.  (*Id.* at 27).

Defendants argue that these percentages are so low as to render a finding of likelihood of

confusion impossible.[18]  (Defs.' Mem. in Supp. 24-25).  The Court finds that the survey alone—

absent other evidence regarding likelihood of confusion—is insufficient to warrant a grant of

summary judgment on this point.  Dr. Isaacson characterizes the findings as "generally below

levels that would routinely be considered significant," (Minch Decl. Ex. 4, at 27), and

Defendants contend that confusion levels below ten percent "clearly favor the defendant," (Defs.

Mem. in Supp. 25).  Absent corroborating evidence, however, the survey alone is not sufficient

to establish that there is no likelihood of confusion.  "Figures below 20% become problematic

because they can only be viewed against the background of other evidence weighing for and

against a conclusion of likely confusion."  J. Thomas McCarthy, 6 *McCarthy on Trademarks and*

*Unfair Competition* § 32:188 (4th ed. updated Nov. 2012); *see also RJR Foods, Inc. v. White*

*Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (upholding district court's finding of likelihood

of confusion based on consumer study showing 15-20% rate of confusion in conjunction with

other evidence).  Viewing the survey evidence in the light most favorable to BLE, the Court is

not convinced that the survey, absent other evidence, is enough to support a finding that there is

no likelihood of confusion.  Defendants have presented insufficient evidence for the Court to

---

[18] Plaintiff argues that the survey was flawed because (1) the "net confusion" finding has no practical value; (2) the survey excluded individuals with a film background; (3) the wrong test market was used; (4) the structure of the survey was confusing; and (5) the control product was flawed. (Pl.'s Mem. in Opp. 26).  The Court does not rule on the overall validity of the survey and assumes it is valid for purposes of this motion.

find that there is no genuine issue of material fact as to this element; consequently, summary judgment is inappropriate.

3.   Fair Use[19]

Section 33(b)(4) of the Lanham provides an affirmative defense to liability where the use of the mark "is a use, otherwise than as a mark,…which is descriptive of and used fairly and in good faith only to describe the goods…of such party."  15 U.S.C. § 1115(b)(4); *see also Naked Cowboy*, 844 F. Supp. 2d at 516 (applying fair use defense to claims brought under Section 43(a)).  In order to determine whether use qualifies as "fair," courts assess "whether the term is used (1) descriptively, (2) other than as a mark, and (3) in good faith."  *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 309-10 (S.D.N.Y. 2010) (Katz, M.J.) (citing *Car-Freshner Corp. v. S.C. Johnson & Son*, 70 F.3d 267, 269 (2d Cir. 1995)).  Defendants have not presented any evidence to meet this standard.  Defendants clearly used Bruce Lee's likeness "as a symbol to attract public attention," which is considered use as a mark.  *Safeway Stores, Inc. v. Safeway Props., Inc.*, 307 F.3d 495, 499 (2d Cir. 1962).  Defendants cannot credibly argue that the images of Bruce Lee were used descriptively.  *See Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (holding that phrase "Sealed With a Kiss" was a non-trademark, descriptive use because it conveyed an instruction); *Car-Freshner Corp.*, 70 F.3d at 270 (finding image of pine tree shape to be descriptive use because it conveyed both characteristic and season of product).  Defendants thus do not qualify for the fair use defense; the use of Bruce Lee's likeness and name was intended to sell the t-shirts, not describe them.

---

[19] The Court also rejects Defendants' contention that Plaintiff's false endorsement claim is preempted by the federal copyright act.  Preemption only applies to *state* laws; federal law cannot preempt itself.

### C.  Count IV: Unfair Competition under the Common Law

Plaintiff also alleges that Defendants AVELA and Valencia committed common law unfair competition.[20]  The parties agree that New York law applies to this claim.  The "essence" of an unfair competition claim in New York state is "the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods."  *Bruce Lee Enters.*, 2011 WL 1327137, at *6 (internal quotation omitted).  The standard for unfair competition under New York law is "virtually identical" to the standard under Section 43(a) of the Lanham Act.  *See LaChappelle v. Fenty*, 812 F. Supp. 2d 434, 448-49 (S.D.N.Y. 2011) (Scheindlin, J.) (dismissing unfair competition claim where plaintiff had failed to prove case under Section 43(a) of the Lanham Act); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp*, 813 F. Supp. 2d 489, 549 (S.D.N.Y. 2011) (Katz, M.J.) ("[T]he elements necessary to prevail or a claim of unfair competition essentially track those required under the Lanham Act." (citing *Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995))).

The Court finds summary judgment inappropriate on the common law unfair competition claim for the same reasons it found it inappropriate for the Lanham Act claim: there is a genuine issue of material fact as to whether BLE holds the rights to the mark and whether there is a likelihood of consumer confusion.

### D.  Count V: Unjust Enrichment

To prevail on its unjust enrichment claim, BLE must establish (1) that Defendants benefitted, (2) at BLE's expense, and (3) that "equity and good conscience require restitution." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation omitted).  "The essence

---

[20] Although the original Complaint asserted this count against all Defendants, the Court dismissed it against Target and Urban Outfitters in its earlier Opinion.  *Bruce Lee Enterps.*, 2011 WL 1327137, at *6.

of such a claim is that one party has received money or a benefit at the expense of another." *Id.* A defendant is unjustly enriched at a plaintiff's expense "'when the defendant receives a benefit of money or property *belonging to the plaintiff.*'" *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l. N.V.*, 425 F. Supp. 2d 458, 475 (S.D.N.Y. 2006) (Daniels, J.) (quoting *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 313 (S.D.N.Y. 1998) (Sweet, J.)) (emphasis added). The measure of damages for an unjust enrichment claim "is restricted to the reasonable value of the benefit conferred upon the defendants," and is "measured by a defendant's unjust gain, rather than by a plaintiff's loss." *Pure Power Boot Camp*, 813 F. Supp. 2d at 534.

### 1. Plaintiff's Motion

BLE claims that "Defendants have been unjustly enriched, to BLE's detriment, by their unauthorized and infringing uses of Bruce Lee's persona." (Pl.'s Mem. in Supp. 30). BLE has failed to provide the Court with any evidence quantifying this benefit nor any evidence from which the Court could conclude that, absent Defendants' alleged misconduct, BLE would have received the profits from the sale of these t-shirts. Summary judgment on this count is inappropriate.

### 2. Defendants' Motion

Defendants ask the Court to dismiss this count "for all of the same reasons" it argues BLE's other counts should be dismissed. (Defs.' Mem. in Supp. 30). Accordingly, the Court denies Defendant's summary judgment motion for the same reasons it denied summary judgment on the other counts. Defendants have failed to show they were not unjustly enriched by their alleged misconduct. The Court agrees, however, that this count should be dismissed as to Target because Target did not sell any t-shirts in New York. (*See* Woo Decl. Ex. 1 (Lurquin Dep.)).

41

**E.  Plaintiff's Motion for Summary Judgment on AVELA's Counterclaims**

BLE has also moved for summary judgment on AVELA's counterclaims, which seek damages for alleged interference with contractual relations and interference with economic advantage.  The Court awards summary judgment in favor of BLE on both claims.

1.   Counterclaim I: Interference with Contractual Relations

AVELA alleges that BLE interfered with its contract with one of its licensees, Trends International LLC ("Trends").  Under New York law, tortious interference with contractual relations requires: (1) the existence of a valid contract between AVELA and Trends; (2) that BLE had knowledge of this contract; (3) that BLE "intentionally and improperly procured the breach of the contract;" and (4) that such breach caused damage to AVELA.  *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996) (citing *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120 (1956)). "Improper intentional interference is generally evidenced by a tortfeasor 'inducing or otherwise causing [a] third party not to perform' his contractual obligations to plaintiff."  *Enercomp, Inc. v. McCorhill Publ'g, Inc.*, 873 F.2d 536, 541 (2d Cir. 1989) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.E.2d 445, 447 (N.Y. 1980)).

First, the only evidence that a contract existed between AVELA and Trends is Valencia's declaration, in which he testified that AVELA's relationship was "not formalized in a written agreement," but rather that Trends would "typically request to review AVELA's archive of artwork and thereafter request images from the archive via email.  After pricing is confirmed, Trends would subsequently issue a purchase order to AVELA for those images."  (Valencia Decl. ¶ 4).  However, the record is devoid of evidence that BLE was aware of any relationship between Trends and AVELA; indeed, BLE's Senior Vice President of Licensing, Alex Stephens,

testified that he first learned of AVELA's involvement with Trends in Trends' response to BLE's cease-and-desist letter.  (Stephens Decl. ¶ 6).

Even assuming such a contract existed and BLE was aware of it, BLE's alleged wrongful conduct—sending a cease-and-desist letter to an alleged infringer—cannot support a tortious interference claim.  While the threat of litigation can give rise to a tortious interference claim, such threats are actionable only as intentional interference if they are "wrongful."  *Universal City Studios*, 797 F.2d at 75.  Wrongful threats are those made where "the actor has no belief in the merit of the litigation," or, even with such a belief, the actor "nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication."  *Id.* (citing Restatement (Second) of Torts § 767). Assuming BLE's cease-and-desist letter constituted a "threat of litigation," neither circumstance for wrongful conduct is met in this case.  BLE sends countless cease-and-desist letters as part of its routine enforcement operations, and does so in a good faith effort to stop unauthorized use of Bruce Lee's likeness.  Further, given that BLE has actually brought litigation to enforce its rights, it seems clear that BLE believes in the merits of its case.

## 2.   Counterclaim II: Interference with Economic Advantage

Plaintiff also moves for summary judgment on AVELA's counterclaim for intentional interference with economic advantage, alleging that BLE's cease-and-desist letter interfered with its ability to receive future compensation from Trends.  (First Am. Ans. 15-16 [Dkt. No. 121]). As a threshold matter, the Court notes that the parties appear to disagree regarding what state's laws apply to this claim: BLE cites New York law in its motion for summary judgment, but AVELA's opposition memorandum cites Nevada law.  AVELA's counterclaims do not cite to any specific state's law in its Amended Answer, and do not state where the alleged interference

occurred.  (*Id.*)  Because the conduct underlying this claim is identical to the behavior underlying the tortious interference claim, the Court applies New York law.[21]

In New York, interference with prospective economic advantage "must be based on a factual showing that: (i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (citing *Burba v. Rochester Gas & Elec. Corp.*, 90 A.D.2d 984, 985 (N.Y. App. Div. 1988)).

The Court awards summary judgment in favor of BLE for the same reasons it did so on the interference with contract claim: the record is bereft of any evidence that BLE "acted solely to injure" AVELA or "used improper means to do so."  *Id.*  AVELA's only evidence to support its claim is a cease-and-desist letter BLE sent to Trends in 2010.  (Defs.' Mem. in Opp. 22).  As noted above, BLE routinely issues cease-and-desist letters to persons it believes to be infringing on its rights in the likeness of Bruce Lee.  AVELA has adduced no evidence indicating BLE acted for a wrongful purpose, nor with any motive other than enforcing its rights.

Consequently, the Court grants summary judgment in favor of BLE on AVELA's counterclaims.

---

[21] The result would be the same even under Nevada law.  In Nevada,

> Liability for the tort of intentional interference with prospective economic advantage requires proof of the following elements: (1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct.

*In re Amerco Derivative Litig.*, 252 P.3d 681, 702 (Nev. 2011).  This standard is substantially identical to the New York standard, and AVELA's claim would fail for the same reasons.

**VI. CONCLUSION**

For the foregoing reasons, Defendants' evidentiary objections are OVERRULED except as to Paragraph 4 of the Chan Declaration, Paragraph 8 of the Storti Declaration, and Paragraph 5 of the Stephens Declaration.  Plaintiff's motion for summary judgment is GRANTED as to Defendants' affirmative defenses to Counts I and III, Defendants' sale of images featuring Bruce Lee's likeness without BLE's consent, and Defendants' counterclaims for interference with contractual relations and intentional interference with prospective economic advantage. Plaintiff's motion for summary judgment is DENIED in all other respects.  Defendants' motion for summary judgment is GRANTED as to dismissing Count V against Target and DENIED in all other respects.

The parties shall, by March 19, 2013, submit to the Court a joint letter outlining any steps that need to be taken before the case is Ready for Trial.  The parties must file a joint pretrial order by April 2, 2013.  The parties shall advise the Court by April 2, 2013 whether they consent to trial of this case before a Magistrate Judge.  The case will be deemed Ready for Trial on April 8, 2013.

SO ORDERED.


Dated: New York, New York
       March 6, 2013


/s/_____
          Kimba M. Wood
          United States District Judge